## EITEL *vs.* WALTER.

*In the matter of the estate of* JOHN WALTER, *deceased.*

THE intestate's wife left his residence, taking their child with her, and for seven years resided with her parents, in Pennsylvania. After her death, the husband of the child's maternal aunt brought her to New York and took her to reside with him, where she continued for five years, until the decease of her father, without any demand being made on the father to assume the care of his daughter, or to pay for her support. *Held,* that there was no legal obligation on the intestate to compensate the uncle for the support of the child during the period in question, and a claim against the estate of the deceased for necessaries furnished, was accordingly rejected.

THERASSON & BRYAN, *for Petitioner.*
STILLWELL & SWAIN, *for Administratrix.*

THE SURROGATE. The intestate died 4th of August, 1849, and on the 16th of that month administration was granted to his widow. In April, 1851, John N. Eitel presented a petition setting forth that he had been appointed guardian of Catherine Walter, minor child of the intestate, on the 3rd of September, 1849, but that the administratrix did not recognize his ward as the daughter of the intestate; and he prayed for an account of the estate. The answer of the administratrix denied the legitimacy of Catherine; and on the issue thus raised, and the proofs taken, I found that she was the lawful child of the deceased. A demand has now been presented against the estate by Mr. Eitel, claiming in his own right as creditor of John Walter compensation for the support and maintenance of Catherine, during her father's life-time. It appears that in October, 1835, the intestate married Elizabeth Herman, and the child Catherine was born in June, 1836. In the fall ensuing, his wife left his residence in this city, taking their child with her, and went to Easton, where she remained with her parents. She returned, and again lived with her

husband a few months in the summer of 1837, and then finally departed, and from that time continued to reside with her parents at Easton until her death, in the year 1844. In January, 1841, the intestate procured a decree of divorce, in the Court of Chancery of this State, by which the marriage was dissolved; he was permitted to marry again, and was to have the "custody, care, maintenance and education of Catherine" his infant daughter. On Mrs. Walter's death, in 1844, Mr. Eitel, the husband of the maternal aunt of Catherine, brought her from Easton to New York, and took her into his family, where she resided with him until the decease of her father. Meanwhile, after his divorce Mr. Walter married again, and continued to live in this city. It is admitted that he never requested Eitel to take charge of the child, and that Eitel never made any demand of the father to provide for her. Indeed, it does not appear that Walter knew his child was living with her uncle, until the spring of 1849, a short time before his death, when he mentioned the fact to one of his friends.

There is evidence in the case, of disagreement between Mr. and Mrs. Walter, and of harsh treatment on his part; but when she last left his house, it appears that he accompanied her to the cars, taking her in his own conveyance, and furnished her with money for her expenses. Whether she left him, to reside with her parents, by mutual consent, or whether she was compelled to go, is difficult to determine, nor do I think it important. She lived away from him many years, and it does not appear that before or after the divorce, either she or her parents made any claim on Catherine's father for her support, or undertook in any way to compel him to perform his natural obligation in that respect. The law on the subject of the liability of the father for necessaries furnished his child, has been laid down with some rigor in the English cases. It is conceded on all hands that he is not liable unless on

some *contract* express or implied. The only point open for discussion is, when the law will *imply* a contract. Whether desertion or neglect forms a foundation of an implied contract is, to say the least, doubtful according to the English decisions. (3 *Stephens, N. P.*, 2051. *Chitty on Contracts*, 146. *Urmston* vs. *Newcomen*, 4 *Ad. & El.*, 899. *Story on Contracts*, § 79. 2 *Kent's Com.*, 5th *Ed.*, 192. *Mortimore* vs. *Wright*, 6 *Mees & Wells*, 482. *Seaborne* vs. *Maddy*, 9 *C. & P.*, 497. *Hodges* vs. *Hodges*, *Peake's Ad. Cas.*, 79.) I think a more humane doctrine prevails here, and that the father is held liable for necessaries, or, in other words, the law will imply a contract on his part, if he refuses or neglects to perform his natural duty to his offspring. (*Van Valkinburgh* vs. *Watson*, 13 *J. R.*, 480.) What facts, however, are sufficient to establish such neglect must depend upon the circumstances of each particular case. It does not appear in the present instance, that the father ever refused to provide for his child. She was taken away by her mother, and lived with her, at the residence of her grandparents in another State, for seven years, without any claim ever advanced against her father either to take her back to his own home, or to provide for her support elsewhere. On her mother's decease she was brought back to the city where her father resided, and taken by her uncle and aunt into their family, and there retained for five years longer, without the slightest indication on the part of Mr. Eitel, that he looked to Walter for her support. I do not think the law will imply a contract under such circumstances. If Mr. Eitel had given the father notice to maintain his child, and he had refused, the case would have been widely different. A father has a right to provide for his child at his own home; and though, in conversation with a friend, Walter said he did not want the child, there is not the slightest ground for presuming that he would have refused to take her back, had Eitel requested him. Indeed,

it is a fair presumption from the circumstances, that the uncle and aunt preferred to have the child with them; and in view of the relationship existing, the natural inference would be that they maintained her without expectation of reward. ( *Williams* vs. *Hutchinson*, 3 *Coms. R.*, 312. *Robinson* vs. *Cushman*, 2 *Denio*, 149.) The conduct of Eitel repels the idea that he acted under the supposition of any contract, express or implied, between him and the father. He made no claim for five years, and the demand first springs into existence three years after Walter's death, although Eitel was appointed guardian in September, 1849. If he did not design to bring up his wife's niece as one of his own family, and maintain her out of his own means, he should at least have given Walter notice, instead of lying by until long after his death. In the absence of notice, the father had a right to infer that Catherine was supported, in the family of her aunt, from motives of affection and natural feeling. There may be cases where such notice cannot be given, growing out of the pressing nature of the services rendered; but here there was ample time to put the parent upon his election, to take his daughter home or meet a claim for her maintenance elsewhere. Failing to adopt this course, Eitel must be presumed to have intended to provide for his niece himself; and in that case there was no implied contract between him and the father. I am of opinion, for these reasons, that the claim should be rejected.