## HALL vs. FINCH, Admr.

*Contract for services rendered by near of kin—Evidence.* .

1. The relation of parent and child, step-parent and step-child, brother and sister, or the like, existing between persons living together in the same household creates a strong presumption that no payment or compensation was intended to be made for services rendered by one to the other beyond that received at the time they were rendered.

2. The person claiming pay for services in such a case must overcome this presumption by clear, direct and positive proof that the relation between the parties was not merely the ordinary one of parent and child, or brother and sister, but was that of debtor and creditor, or servant and master; and must show some arrangement or contract to that effect.

3. In the present case, which is a claim against the estate of plaintiff's brother for the value of her services during several years while she resided in his house, acting and being treated as the mistress thereof, this court finds no facts proven sufficient to sustain the verdict in her favor, and therefore reverses the judgment of the circuit court, and affirms the report of commissioners in the county court disallowing the claim.

APPEAL from the Circuit Court for *Jefferson* County.

The respondent in September, 1868, presented a claim to the commissioners on the estate of her deceased brother for allowance as follows, viz.:

Hall vs. Finch, Administrator.

" THE ESTATE, ETC., DR.

| | |
|---|---:|
| "To services as housekeeper for said F., from April, 1846, to October, 1855; and from September, 1857, to April, 1865— 17 years, at $100 per year ............................. | $1,700 00 |
| "To money had and received to her use by said F., being percentage on collection on taxes in the town of Koshkonong for the year 1856 ......................... ........ | 180 00 |
| "To money borrowed ($3) in February, 1868, with interest at 10 per cent, compounded annually, as per agreement.... | 8 15 |
| "To interest on account of first two items less amount of credits as below, from April, 1865..................... | 438 66 |
| | $2,326 81 |

" CR.

| | | |
|---|---:|---:|
| "By clothing and other articles furnished claimant while employed as above, 17 years, averaging $15 per year ................................. | $255 00 | |
| "By cash, year 1857............................. | 5 00 | |
| | | $260 00 |
| "Balance ... ........................................... | | $2,066 81" |

The administrator disputed such account, on the grounds that every item of it was barred by the statute of limitations; that during about nine years of the time the claimant was a married woman, and not herself entitled to the pay for her services, if any was due; and that, during the time she lived with the deceased, he boarded her and her daughter, and furnished them with a home, fed and took care of her stock, and let her have many necessaries of life.

The commissioners rejected the claim, and the respondent appealed to the circuit court for Jefferson county, and there obtained judgment in her favor for $300, from which the administrator appealed, a motion for a new trial having been denied. The facts proved are very fully stated in the opinion of the court.

*L. B. Caswell*, for appellant, argued that when services are rendered by near of kin, under circumstances like those in this case, an express agreement to compensate must be shown, citing 3 Coms., 312; 2 Denio, 149; 5 Watts & Serg., 357; id., 514; 16 Vt., 150; 4 Carr. & Payne, 93; *Defrance v. Austin*, 9 Barb., 309; *Duffey v. Duffey*, 44 Pa. St., 399; *Hartman's Appeal*, 3

Grant Pa., 271; *Updike v. Titus*, 2 Beasley, N. J., 151; *Davison v. Davison*, id., 246; *Bowen v. Bowen*, 2 Bradf., N. Y., 336; *Loret v. Price*, Wright, 89; *Griffin v. Potter*, 14 Wend., 209; *Livingstone v. Ackerton*, 5 Conn., 530; *Utica Ins. Co., v. Bloodgood*, 4 Wend., 652; *Fisher v. Fisher*, 5 Wis., 472; *Kaye v. Crawford*, 22 id., 320; *Putnam Adm'r v. Town, Ex'r*, 34 Vt., 429; that the verdict was clearly against the weight of evidence, and should be set aside, citing *Whalon v. Blackburn*, 14 Wis., 432; *Ray v. Bullock*, 46 Ill., 64; that proof of an intention to compensate by will, should not have been admitted, citing *Hunter v. Hunter*, 3 Strobh., 321; that the court erred in instructing the jury that the plaintiff could recover if her services were rendered pursuant to the request of the deceased; that the simple question was, were the services rendered in expectation of being paid therefor over and above what the claimant may have received, because an express agreement was necessary, and the burden of proving it was upon the claimant; and that the verdict was excessive, the court having instructed the jury that they could not in any event allow the plaintiff for her services for more than one year, and it should therefore be set aside, citing *Jewell v. Gage*, 42 Maine, 247; *Packard v. Bates*, 38 Ill., 40; *Rockwell v. Daniels*, 4 Wis., 432; 6 id., 580; *Smith v. Phelps*, 7 id. 211; *Roberts v. Muir* 7 Ind., 544; *Finch v. Brown*, 13 Wend., 601; 4 Abb. Dig., 143, and cases cited; *McIntyre v. Clark*, 7 Wend., 330; 3 id., 356; *Hayward v. Ormsby*, 7 Wis., 111; *Whalon v. Blackburn*, 14 id., 432.

*Weymouth & Porter and G. W. Burchard*, for respondent. [No brief on file.]

Dixon, C. J., We must say in this case, as we said in another involving much the same question (*Kaye v. Crawford*, 22 Wis., 322), that the verdict should have been for the defendant. The testimony fails entirely to show that the services for which the claimant seeks to charge the estate were rendered in pursuance of any agreement or understanding that they were

to be paid for by the intestate in his lifetime, or out of his property after his decease. The facts present but the common case where one near of kin has given to another, who was dependent and destitute, the privileges of a home, and provided the necessaries and ordinary comforts of life, in sickness as well as in health, according to his situation and circumstances, upon the presumed consideration of the services to be rendered by such other, as well as in consideration of the ties of relationship and good will existing between the parties. The deceased and claimant were brother and sister. The deceased was never married, but died a bachelor, in the month of February, 1868, at the age of fifty-five. From the year 1840, and for some time prior thereto, to the time of his death, he was a farmer, residing and keeping house upon his farm of 160 acres of land in Jefferson county.

In the latter part of the year 1840, his father and mother, brothers and sisters, including the claimant, came to reside with him in his house upon the farm, and so continued to reside until the death of his mother in 1845. His house was the home of his father's family. For about three weeks before her mother's death, claimant was engaged in the service of a neighbor, one Heyden, for ten or twelve shillings per week, and at the end of that time and during the sickness of her mother, upon going with Mr. Heyden to the house of deceased on a visit, deceased informed her and Mr. Heyden that he had great need of her assistance and could not let her go back. She remained with deceased, and from that date commences her account or claim for services. She continued to reside there, acting as house keeper for him and such other persons as composed his family, from that time until the fall of 1854. In September, 1851, she married one Davis, who, it seems, was a poor man and had worked for deceased upon his farm.

Davis continued so to work, or to carry on the farm upon shares, after his marriage, and until the fall of 1854, when, his health giving way, he and his wife moved from the house of

deceased, and she did not return there until some time in the year 1857. She had two children, the offspring of her marriage with Davis; one, a daughter, still living, born in 1852. The other died in infancy. Davis died in the autumn of 1856, and in 1857 claimant, taking her daughter with her, went back to reside with and keep house for her brother, as she had done before her marriage and during the time that she and Davis lived in his house. Davis, it would seem, had no home. He died at his father's house, leaving claimant in indigent circumstances. Immediately after his death, claimant went to reside with a married sister living in the same neighborhood, and remained there until her return to the house of deceased the following year. At that time, and indeed before the death of her husband, it appears that deceased was anxious to have her return, and often requested her to do so. He said he required her care and assistance in the management of his household affairs, or, as expressed by several of the witnesses, represented that " everything was going to rack and ruin " without her. After her return she continued to live with him until the fall of 1867, a few months prior to his death.

In August, 1862, she was again married to one Hall, her present husband, who, it appears, was also a laborer upon her brother's farm. Soon after his marriage, Hall entered the military service, and was absent in the army for some years, but precisely when he returned is not shown. After his return, it would seem, he continued to labor upon the farm as before, until the fall of 1867, when, with his wife and her daughter, he removed to a distant part of the state. Such is a substantial history of the case and statement of the testimony, except that part of it touching the value of claimant's services, the manner in which they were performed, and her position in and relations to her brother's family during the respective periods of her residence in it. Respecting her services, the proof is that they were quite valuable; that she was an excellent housekeeper, skillful with the needle, faithful, industrious and frugal, and

managed the domestic affairs of her brother and discharged her duties to his entire satisfaction.

But the proof also is, that during all the same time her brother cared for and provided her with suitable clothing and other necessaries; that he looked after and supplied her wants, and supported her in all respects as he would have done a wife or daughter or other inmate or member of his family; that she had all the rights and enjoyed all the privileges in his house that a wife or a daughter of like age would have had or enjoyed; that she was mistress of the household, came and went, and visited and received visitors, as she pleased; that her brother's horse and buggy were always at her service; and she used them to ride or drive as she wanted; that she drove to town, did the marketing, sold butter and eggs and other like products as housewives are accustomed to; and that during her widowhood, and after her second marriage, her daughter, who lived with her, was cared and provided for and maintained and educated by her brother as his own daughter would have been.

It is likewise in proof that, during a considerable portion of the time, claimant was not in good health, but feeble and infirm, and subject to occasional attacks of sickness; and that at such times medical and other necessary care and attendance were provided by her brother and at his expense. It is furthermore in evidence that, for much the greater part of the time, and especially during the summer seasons when the family was large, a servant girl, and sometimes two, were employed to do the house work, and thus to relieve claimant from labor and responsibility except as to the general oversight and direction of affairs in the house. Still other testimony shows that, during the last ten years of her residence with her brother, she owned some live-stock, which was raised and kept by him on his farm as he kept his own, and that when she moved away with her present husband, in the fall of 1867, she took with her sixteen or seventeen sheep and two cows. And when she left on that occasion, it is in testimony by a witness who

was assisting her and her husband, that she expressed her sorrow, and said "she had made it her home for twenty-seven years; it had been a home for all of them; she thought they would be back in two or three years," etc.

And, finally, it is in evidence, and shown beyond any reasonable doubt, that, during all the period of time while these relations existed, there was never anything like an account or reckoning between the parties, any charge on the part of claimant for her services, or any claim or demand by deceased for board, clothing, or any necessaries or supplies which he had furnished. No one of the witnesses—some of them brothers and sisters of claimant, and all of them very intimate and familiar with the family—not even of those most friendly to claimant and apparently anxious to sustain her cause, pretends to testify to any conversation, admission or statement of any kind, direct or indirect, in which it was said or intimated by deceased or by claimant, that she was at work for wages, or that he or she ever expected or supposed that any payment was to be made, or other compensation received, than that given and received from day to day during the time of her residence with him.

The only facts in the case which can be construed into a request to serve, or made anything like the basis of a contract or promise to pay for services, are the statement made by deceased in 1845, when claimant came back from Heyden's, and again his solicitation for her return in 1857, after the death of her first husband. It is impossible that the statement, or command, if one pleases, in 1845, should answer the purpose contended. His house was then her home, and had been for several years. Her father and mother resided there, and, as she said more than twenty years afterwards, it was "a home for all of them." She had gone out for temporary service merely, and what deceased then said amounted to no more than representing in plain language, as he would naturally do, what he considered was her duty under the circumstances.

It appears she took the same just view of the matter which

he did, and remained at home where her assistance was required, as it would have been strange if she had not. And in 1857, also, when he asked her to return, that was but an invitation to her to make his house her home, and was necessarily understood and intended to be a renewal of former relations, a tacit agreement to live together on the same terms and in the same manner as before. He was in want of a housekeeper, and she in want of a home. Her health, never firm, was now more impaired than formerly, and she was in a great measure physically incapable of earning a livelihood for herself and her child. Her brother, it appears, well understood this, and only desired her to oversee his household affairs. If at that time, or if on the first occasion, in 1845, claimant had been offered her choice to live with her brother as she did do, or to go and earn her living among strangers as a mere servant or employee at wages, can there be a doubt what her choice would have been?

As observed by the court of appeals in a like case, *Williams v. Hutchinson*, 3 N. Y., 319: "There are considerations growing out of the relation which the parties sustain to each other, which cannot be computed in money." So here, there were considerations growing out of the relation which existed between claimant and her brother, his tenderness and regard for her and her child, and the affection which he uniformly manifested, which money could not have bought, and which never could have been realized among strangers. There can be no doubt that claimant would not have exchanged these considerations, and the comforts of a good home of which she was substantial ruler and mistress, for all the money which any witness is able to compute or testify she might have earned as a menial or servant elsewhere, or in the houses of those feeling no especial interest in or regard for her happiness and welfare.

It becomes our duty, therefore, as it has not unfrequently been the duty of courts heretofore, upon careful study of the case, to say that there is no evidence of any contract or promise on the part of deceased, upon which the charge, which claimant

now finds it convenient to make against his estate, is or can be sustained.    Such charges have been often made, and the books abound in precedents of their defeat.    In our judgment, there is not a single fact in the case that does not tend to rebut the implication of an agreement, or promise, or engagement between the parties.    It is no mere matter of surmise or conjecture, but all the facts and circumstances show clearly enough that nothing of the kind ever entered into their minds.

But, in cases of this nature, the rule of law is not that the administrator or representative must establish a negative in order to defeat the claim.    The relation existing between the parties, as parent and child, step parent and step child, brother and sister, and the like, is itself strong negative proof, and raises a presumption that no payment or compensation was to be made beyond that received by claimant at the time, which can only be overcome by clear and unequivocal proof to the contrary.    The evidence must be clear, direct and positive that the relation between the parties was not the ordinary one of parent and child, or of brother and sister, but that of debtor and creditor, or of master and servant.    To establish this new relation, it is obvious that some arrangement or contract to that effect must be shown.    No man is to be made debtor without his knowledge or assent, or under circumstances where he has no reason to expect that such is his position or liability.

In the language of this court in the case first above cited, the party seeking to recover compensation for services rendered under such circumstances must show an " agreement or understanding that they were to be paid for."    And such has been the view uniformly taken by this court whenever the subject has been alluded to.    *Fisher v. Fisher*, 5 Wis., 472 ; *Mountain v. Fisher*, 22 Wis., 93.    In regard to such agreement or understanding, it is manifest from the nature of the case that it can in general be arrived at only by express stipulation between the parties; and, accordingly, we find the best considered authorities holding that an express contract must be shown.

Thus, in *Hartman's Appeal*, 3 Grant's Cases, Judge STRONG, delivering the opinion of the court, says: "And as, under the circumstances, the law implied no obligation on the part of deceased to pay, before the appellant can claim as creditor he must prove an *express* contract. Admitting what is not entirely clear, that the services, rendered as these were, imposed a moral obligation to do more than was done by the will, sufficient for a consideration for an express promise, yet the evidence of such a promise must be *direct, clear* and *positive*. Loose declarations made to others, or even to the claimant himself, will not answer. That which is only an expression of intention is inadequate for the purpose. *It must have been the purpose of the deceased to assume a legal obligation, capable of being enforced against him.* The ordinary expressions of gratitude for kindness to old age, weakness and suffering, are not to be tortured into contract obligations."

And, in relation to the kind of evidence required to establish the contract, it was said in *Duffey v. Duffey*, 44 Pa. St., 402, that it could not be, "unless upon clear and unequivocal proof, leaving no doubt." And in *Bash v. Bash*, 9 Pa. St., 260, it was held to entitle a son to recover for the breach of a contract by the father, that if the son would continue to live with and work for him, he would leave him his farm, that the evidence of the contract must be *direct and positive*; and that it was error to instruct the jury that, instead of such evidence, it was sufficient if it was clear and satisfactory. In that case Chief Justice GIBSON said: "It is settled by the decisions quoted, that a contract for testamentary compensation of work done for a father by a son after his majority can be proved only by direct and positive evidence of it; yet, for "direct and positive," the judge substituted, in his charge, "clear and satisfactory," and thus put such a contract, as to proof of it, on the footing of a contract between strangers unaffected by any personal relation. The course of this court has been to hold a tight rein over it by making the quality, if not the sense of the proof, a

subject of inspection and governance by the court, and by holding juries strictly to the rule prescribed, instead of suffering them to be led away by considerations of hardship, or paternal injustice. Every man must be allowed to make his own contract, as well as his own will; and, to prevent jurors from making it for him according to their peculiar notions of fitness and propriety, we have held that the evidence of a contract to compensate the services of a child must be positive and direct. But evidence, clear and satisfactory in the estimation of a jury, may be neither. It may be no more than presumptive and inferential; and if that were sufficient, it would be easy to see how every case of this sort would go. To an unpracticed eye, loose and inconsiderate expressions, such as make up the mass of evidence in this case, and presumptions or probabilities resting on circumstances, may seem perfectly clear and satisfactory; but they constitute not the proofs by which such a contract is to be established in conformity to the judgment of this court."

And to the same effect is *Candor's Appeal*, 5 Watts & Serg., 513, where, speaking of " the great hazard of allowing such a claim on such flimsy pretexts," the court say : " The temptation to fraud, particularly where the family are in straits and difficulties, is too great. A court of justice does the most signal service to the community when they remove, as far as human law can, all temptation to fraud, and its kindred vice, perjury. We must carefully avoid throwing temptation in the path of integrity and truth." And, in *Lynn v. Lynn*, 29 Pa. St., 369, it was also ruled, that without an express contract there can be no recovery in such case. In that case the court observe: " Causes of this character are among the most odious that courts have to deal with. Very commonly they are brought in order to obtain from a parent's estate, by way of debt, a larger share than other heirs, as a sort of discriminaton for supposed larger merits. But the law cannot make up for such differences, and it does not aim at impossibilities. In the administration of family affairs, and in the expenditure of time,

care and money on the several children, there are necessarily very great differences, and the results are very different; but the law cannot equalize them. It would produce the most deplorable strife and litigation in families in attempting it; and then it would certainly fail. Better that the largest estate should be entirely destroyed, than that the attempt should be made in a single case." In addition to the foregoing, see also *Sevires v. Parsons*, 5 Watts & Serg., 358; *Defiance v. Austin*, 9 Pa. St., 309; *Lantz v. Frey and Wife*, 14 id., 201; *Cummings v. Cummings*, 8 Watts, 366; *Pelly v. Rawlins*, Peake's Add. Cases, 226; *Eitel v. Walter*, 2 Bradford, 287; *Fitch v. Peckham*, 16 Vt., 150; and cases cited to this point on the brief of counsel for appellant.

The rule of the above cases may seem somewhat stringent, but we are satisfied it is founded on considerations of wisdom and sound policy, which abundantly justify and sustain it. The peace and harmony of many otherwise happy families would be entirely broken up and destroyed, by the strife and controversies which would ensue through the fraud of some and the avarice and litigiousness of others, if any other rule were adopted. In the present case, it would have been far better had the claimant been satisfied to take her share of her deceased brother's estate, equally with her other brothers and sister, who together constitute the heirs, than that this unfounded claim should have been presented, to be followed by three or four year's expensive and most vexatious litigation, which in the end comes to nothing but a large bill of costs for claimant to pay, and which it is evident she can ill afford to lose.

The judgment of the circuit court must therefore be reversed, and the decision and report of the commissioners in the county court, disallowing the claim, and from which appeal was taken by claimant to the circuit court, must be affirmed; and the decision and judgment of this court must be certified to the county court in pursuance of the statute in such case made and provided. R. S., ch. 101, sec. 26.

This cause came on to be heard on appeal from the judgment of the circuit court for the county of Jefferson, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of said circuit court in this cause be, and the same is hereby, reversed, with costs, and that the decision and report of the commissioners in the county court of Jefferson county disallowing the claim of respondent be, and the same are hereby, in all respects, affirmed. And it is hereby further ordered that a certified copy of this order be transmitted to said county court, and also that another like copy be transmitted to said circuit court, to be entered of record therein.