ESTATE OF ANSELL: FRANK, Appellant, vs. SHAPIRO, Executrix, Respondent.

*October 7—November 5, 1957.*

For the appellant there was a brief by *Crawford, Crawford & Cirilli* of Superior, and oral argument by *Brandon E. Crawford.*

For the respondent there was a brief by *Johnson, Fritschler, Barstow & Witkin* of Superior, and oral argument by *Barney B. Barstow.*

BROADFOOT, J.   The decedent, a resident of the city of Superior, died there on October 2, 1953. He had been engaged in business in that city for many years and left an estate of more than $100,000. At the time of his death he was seventy-one years of age. His heirs were his widow and four adult children. For several years Mr. Ansell had not been in good health and among other afflictions he was nearly blind, at least until 1948 when he had an operation for the removal of cataracts from his eyes. For several years he spent the winters in Miami Beach, Florida. He became acquainted with the claimant in the fall of 1943.

At the time of the hearing the claimant was fifty-three years of age and had been a divorcee for twenty-four years. She was not related to the decedent. In 1943, she resided with her mother, a sister, a brother, and her aunt in Miami Beach. Her mother owned a ladies' ready-to-wear store in Miami Beach in which the other members of the family worked.

The claim was based upon an alleged agreement that the decedent would make the claimant the beneficiary of an insurance policy on his life issued by the Equitable Life Assurance Society in the principal amount of $12,000. The consideration therefor, as alleged in the claim, was services rendered by the claimant in the form of secretarial work, providing an automobile and driving the decedent from place to place when he was in Florida, the furnishing of meals and

the use of an apartment during the winters of 1946 to 1950. The claim further alleged that the claimant furnished to the deceased various sums of money and purchased items of merchandise for him from the year 1946 to and including the year 1953. The claim further alleged that in consideration of the services performed and to be performed by the claimant, the deceased further agreed to transfer to her a government bond of the value of $15,000 and also that he would transfer to her certain shares of stock of the American Telephone & Telegraph Company, the value of which was unknown to the claimant. In the alternative, a claim was filed in *quantum meruit* for the value of board and room furnished to the decedent amounting to $9,300 and for money expended on decedent's behalf in the amount of $298.55, or a total of $9,598.55.

Upon the hearing, the claimant first attempted to establish an express agreement that the decedent would make her the beneficiary of the life insurance policy and that he would transfer the government bond and the corporate stock. The claimant testified to the services performed by her and by members of her famliy for the decedent. The secretarial work referred to in the claim was the writing of letters for the decedent, two of which appear in the record. She further testified that she had expended money on behalf of the decedent for doctor bills, eyeglasses, drugs, liquor, and clothing; that she had loaned him money at various times; that she made four plane trips to Superior to see the decedent at his request at a cost of $200 for each trip; that her sister had provided the use of an apartment for him for four separate winter seasons, and that he took one meal per day with the family during a six months' period for several years.

She, of course, was not competent to testify to the agreement. The only proof offered to establish such an agreement was by the testimony of one Mary Fields, a clerk in the decedent's store, and by the testimony of her brother, Herman

Frank. The pertinent testimony of Mary Fields was as follows:

"*Q*. Did you ever have any conversation with Mr. Sam Ansell concerning a policy of insurance and Miss Leah Frank? *A*. Yes. . . .

"*Q*. Where did the conversation take place? *A*. I worked on the balcony and his office was on the side. I used to go to lunch between 11:30 and 12:30. He come about 11 o'clock and told me to get Mr. Barstow on the 'phone to come and see him. I called Mr. Barstow, and his girl answered and said Mr. Ansell should come right over. So Sam left and went to Mr. Barstow's office, and then I left for my lunch, and after I came back, maybe about 1 o'clock, he came back and he told me then that he had taken out a policy for Leah, and he said that he figured he could never repay them, he said—speaking of the family who he spoke of so often, who were so good to him—the sister, and brother, and the mother, and the aunt, and he said he made the policy over that day— over to Leah.

"*Q*. Did he say why he had made it over to her? *A*. He said to repay her for all the goodness and things she and the family had done for him. That's the way he put it."

The pertinent testimony of Herman Frank as to the alleged agreement was as follows:

"*Q*. During this period of time from 1944 down through 1953 when you drove him, did he ever pay you for those services? *A*. Never was paid anything; never expected anything.

"*Q*. Why did you render him those services? *A*. Being I understood he was going to give my sister a policy—I let it go at that. Thought maybe it would compensate us for what we were doing for him.

"*Q*. When did you have conversation with him concerning the policy? *A*. One time he told me he was going to give it to her, and about a year later he told me he had given it to her.

"*Q*. When was that he told you he was going to give her a policy? *A*. Maybe 1947.

"*Q.* Recall the time and place? *A.* Yes, I had him out in the car and I think we stopped some place—at the barbecue place for a drink, and during the conversation he told me he was going to give her a paid-up policy of life insurance.

"*Q.* And subsequent to that he told you he was going to give her a policy? *A.* At a later date, about a year later, he told me he had given her one."

The record establishes that at the time of Mr. Ansell's death he was the owner and holder of an insurance policy upon his life issued by the Equitable Life Assurance Society dated July 21, 1923, and bearing a note "Rewritten November 17, 1937" in the sum of $8,000. The beneficiary named was the insured's wife, Ida Ansell. By the terms of the policy the insured reserved the right to change the beneficiary. The record further shows that on March 30, 1948, Mr. Ansell requested that the beneficiary named in said policy be changed to the name of the claimant, Leah Frank. This change was made by the insurance company. On November 19, 1952, the insured again changed the name of the beneficiary in said policy from the claimant to his wife, Ida Ansell. The insurance due upon said policy was paid to Ida Ansell, the named beneficiary, after decedent's death.

Following the cross-examination of Miss Frank by the attorney for the estate, it was contended by claimant's attorney that certain questions asked in the cross-examination had opened the door so that Miss Frank was competent to testify directly to conversations had with Mr. Ansell during his lifetime as further proof of the agreement. The trial court excluded her testimony but took the same subject to the objection as an offer of proof. It is only through that offer of proof that anything appears in the record with reference to the government bond and the corporate stock. The trial court did not rule directly upon the admissibility of the testimony of the claimant contained in the offer of proof. The court said in its memorandum decision that even if it

had considered it competent evidence, it would not have altered the conclusions arrived at in any respect.

A review of the record shows that the cross-examination did not open the door to make that testimony competent, and it was properly excluded by the court originally when the offer was made.

The trial court found that the claimant had failed to prove an express agreement or contract to make the claimant the beneficiary in the life insurance policy in consideration of services rendered or to be rendered by claimant to decedent, and that the policy was never delivered by decedent to the claimant. We concur in that finding.

Upon the alternative claim the claimant contends that in the absence of an express contract she is entitled to the value of the services rendered to the decedent under an implied contract. There is a rule that if a person performs valuable services for another at his request the law implies the making of a promise by the latter and acceptance thereof by the former to pay the one performing the service the reasonable value thereof. *Estate of St. Germain,* 246 Wis. 409, 17 N. W. (2d) 582. In *Adams v. Congdon,* 259 Wis. 278, 48 N. W. (2d) 469, this court held that, where a claimant furnished support for a decedent under a void contract, specific performance could not be required and no damages could be recovered for the breach by the decedent, but the party who furnished the support in performance of a void contract was entitled to restitution of the value thereof from the estate of the decedent. The trial court found that there was no implied agreement on the part of the decedent to pay for the various items contained in the alternative claim. In its memorandum decision the trial court said:

"The testimony is direct and positive concerning the items of rent, board, and transportation which the claimant alleges she performed for the decedent. The apartment which Mr. Ansell is alleged to have occupied was owned by claimant's

sister, Florence Frank, who owned the building and furnished the apartment, and that claimant at no time made any payment for it to her sister. If there were any claim for this rent it belongs to the sister. The same situation exists as to services in preparing and furnishing meals. They were furnished by claimant's mother and aunt, and claimant testified she had not prepared a meal in fifteen years. It was the aunt's home and not the claimant's. If there were any claim for this board it belongs to those furnishing the board. The brother furnished transportation for the decedent with the brother's automobile, and the brother testified that he never expected to be paid for his services. If there were a claim it would be the brother's and not the claimant's. It is elemental that a person does not have a claim for services rendered by someone else.

"There is no direct testimony in the record that claimant intended to charge Mr. Ansell for any of the various small favors which she claims that she personally did for him."

In this connection it might be recited that there is no competent evidence in the record to show that the decedent requested the services, that any adequate records were kept, that any demand was made upon the decedent for payment during his lifetime, although he had ample funds with which to make payment for any and all of the services rendered. The trial court felt that the testimony of the claimant was seriously impeached. She denied the receipt of any money or checks from the decedent and then was confronted with four checks signed by him, two of which were payable to her directly and the other two of which were payable to cash, but which were indorsed and deposited in the Frank store account.

The trial court further felt that the claim was exaggerated and fictitious in many respects and after viewing the claimant upon the witness stand and hearing her testimony he had grave doubt as to her veracity. The trial court referred to the following quotation from *Will of Goldrick,* 198 Wis. 500, 502, 224 N. W. 741, given in *Estate of St. Germain, supra*:

"There is undoubtedly a strong temptation to participate in the estates of deceased persons by magnifying trifling services into large claims, when the persons to whom the supposed services were rendered are dead and have no answer to make."

From a careful examination of the record we conclude that the findings and conclusions of the trial court are supported by the record.

*By the Court.*—Judgment affirmed.