IN the MATTER OF the ESTATE OF Virgil A. STEFFES, Deceased: Mary Lou BROOKS, Plaintiff-Respondent,

v.

Terry V. STEFFES, personal representative, Defendant-Appellant.

Supreme Court

*No. 77–171. Argued December 3, 1979.—Decided April 8, 1980.*
(Also reported in 290 N.W.2d 697.)

For the appellant there were briefs by *F. J. Antoine* and *Peterson, Antoine & Peterson* of Prairie du Chien, and oral argument by *F. J. Antoine*.

For the respondent there was a brief by *McIntyre, Kinney, Urban & Schrader* of Lancaster, and oral argument by *Thomas T. Schrader*.

SHIRLEY S. ABRAHAMSON, J. The question on appeal is whether the plaintiff, who engaged in an adulterous relationship with the deceased, may recover from the estate for unpaid salary, wages or other compensation for personal services rendered to the deceased within the two-year period preceding his death.[1]

Virgil Steffes died without a will on July 17, 1976. His gross estate was valued at $733,644.65. Steffes was survived by a son, who is an heir and the personal representative of the estate, and children of a deceased son, who are heirs. The plaintiff, Mary Lou Brooks, filed a claim against the estate in the amount of $29,200.00 for personal services rendered to the deceased during the last two years of his life (July 17, 1974–July 17, 1976). The estate refused to pay the claim and this litigation ensued. The trial court rendered judgment allowing the claim against the estate in the amount of $14,600.00.

There is no dispute that plaintiff rendered services for Steffes on the farm and in his home and that she gave him excellent nursing care during his lengthy last illness. Steffes' son had been a guest in his father's home

---

[1] Sec. 893.01, Stats., provides:

"**Civil actions; objection as to time of commencing.** Civil actions can only be commenced within the periods prescribed in this chapter, except when, in special cases, a different limitation is provided by statute. But the objection that the action was not commenced within the time limited can only be taken by answer or motion to dismiss under s. 802.06 (2) in proper cases."

Sec. 893.21 (5), Stats., provides:

"**893.21 Within 2 years. . . .**

". . .

"(5) Any action to recover unpaid salary, wages or other compensation for personal services, except fees for professional services."

before his father's death, and he testified that he had eaten meals cooked by the plaintiff, that his father's home was kept in good condition, and that the plaintiff took good care of his ill father.

The son, as personal representative, appeals the judgment on three grounds: (1) that the facts do not sustain the trial court's findings that the plaintiff rendered services at the request of and with the knowledge of the deceased and with the expectation of compensation; (2) that any services rendered are presumed to be gratuitous because plaintiff lived for more than six years as a member of Steffes' household and that the requirement that there be an express promise to pay for such services was not met; and (3) that the plaintiff cannot recover compensation for the work she performed in the house and on the farm, because Steffes and the plaintiff had engaged in sexual intercourse.

We affirm the judgment of the trial court.

## I.

The facts are not in dispute. Mary Lou Brooks, the plaintiff, met Virgil Steffes, the deceased, in 1969, while the plaintiff was working in a tavern, and soon thereafter she moved to Steffes' farm home where she resided until his death. Plaintiff and Steffes were each married to other persons. Plaintiff knew Steffes was a married man, and he continued to be married until his wife died in 1974. The plaintiff had been married in 1963 and had two children. She continued to be married while she lived in the deceased's house, initiating divorce proceedings after Steffes' death. Plaintiff admitted having sexual relations with Virgil Steffes until about a year before Steffes' death. Plaintiff and numerous witnesses testified that neither plaintiff nor Steffes had represented her as Mrs. Virgil Steffes.

According to the plaintiff's undisputed testimony she performed the following chores in the house and on the farm: she cleaned the house, did the cooking, washing, and ironing; she helped fix farm fences; she picked the corn crop; she ran the combine and loaded the corn into a "semi" during late 1974; she chased animals which escaped from the pasture; from the end of October until May (1974–1975) she loaded silage; she aided the deceased in pouring concrete walls around the feedlot; she aided the deceased in remodeling his home by "tearing out partitions" and by setting forms, pouring concrete, and pulling the forms; she wrote all the deceased's checks (with one or two exceptions) under the deceased's direction over the two-year period in question, signing his name along with her initials; and she cleaned and prepared machinery for the April 1975 farm sale. The amount of work performed by the plaintiff may be gauged by the size of the farming operation. In July, 1974, there were 80 head of Charolais cattle and approximately 20 registered Morgan horses on the farm. There were also 325 acres of corn on the farm in the spring of 1975.

The plaintiff also described the nursing care she gave Steffes. In the fall of 1974, his health began to deteriorate. He suffered from headaches and dizzy spells. In March, 1975 he was hospitalized and tests revealed a brain tumor; surgery was performed. Plaintiff stayed in a chair beside Steffes' bed for four days and nights while he was in the hospital. For twenty-eight consecutive days after Steffes' surgery, plaintiff drove him to the hospital for cobalt treatments. Steffes' condition continued to worsen during 1976 and plaintiff's care continued. Plaintiff's testimony relating to the care she gave Steffes during his illness was summarized by the estate's counsel as follows:

". . . In the summer of 1975 after surgery, Virgil still had headaches and had so much pressure from the tumor. He went blind in his left eye. I took him for eye tests and he got a little weak in his right side in 1976. In the fall of 1975 there was only horses left. . . . The remodeling of the house was completed in April, 1976. The slight stroke or weakening of Virgil Steffes was when we were working in the house about three weeks before we moved in. We moved in around April 1st. He called me. He couldn't use his leg it was so weak and his arm. We were still working there. Laudel Culver and Don Urbanek and Bill and Daisy Crubaugh, we were all in the house working that evening and Virgil and I went up to the other place. He said he did not know what was wrong, his legs seemed weak and that. Then I exercised his leg and his arm by working his leg up and down, back and forth, trying to keep the strength in it and his arm. I took him back to La Crosse for a checkup and they took x-rays and the doctor showed me the x-rays where the tumor was coming back and I told him about Virgil's leg and that and he says to exercise it, and so I did and that's when they put him on some pills and he had to have them every four hours. They were to keep the pressure off where the tumor was coming back. Virgil got kidney infection and I took him back, and they gave him pills. They wanted to use a catheter and he said no. I bought a urinal and sat beside him. If he could, for awhile he could help himself when he had to use it and then he got that he couldn't use it. If he wet himself I changed his clothes and if he had an accident in bed, I would change the bed in the middle of the night. This went on during June, 1976. After March, 1976 he had a stroke that affected the whole one side of him and so then in order for him to walk I would slide my foot under his and pick his foot up and walk him that way. He was going to the doctor and the hospital during this time. I took him for his checkups. I would lift him out of the chair and then I would slide my foot under his and put my arm around him, put my arm around him and he would lean on me and we would get to the car that way. Be the same thing at the hospital. If I had to park some place out in the parking lot too far away, then I would go and get or Greg Gebhard might go with me.

Sometimes Mike Urbanek rode along and they would run in and get a wheel chair and bring it out and then I would wheel him into the hospital and wheel him out to the car. Then towards the last when his whole side went I couldn't even walk him no more. I went into Bohlman's Drug Store and rented a wheel chair for at the house too. . . . Mr. Steffes died July the 17th '76."

Plaintiff testified that she received the following items from the deceased during this two-year period: food and lodging; approximately $7,200.00 from the sale of horses and cows which deceased had given to plaintiff to take care of; $3,200.00 towards a $4,544.00 Pontiac which was purchased June 22, 1976 and titled in the plaintiff's name.

The trial court summarized the plaintiff's efforts as follows: "Now this lady although she was not a mason [she] did cement work, and although she was not a carpenter she did carpentry work, and although she wasn't an accountant she did bookkeeping work, although she was not a nurse she rendered nursing services."

Plaintiff testified that she expected to receive something for the services she performed for Virgil Steffes during the last two years of his life. The deceased's brother-in-law and friends of both the plaintiff and the deceased testified that Steffes had indicated that he wanted to provide for the plaintiff and that he wanted her to have the house and farm on his death. However, Steffes did not execute a will and sold part of the farm on land contract and gave the purchasers an option to purchase farm property.

II.

The trial court found that the plaintiff went into the deceased's home as a housekeeper, that the housekeeping, farming and nursing services "rendered by her were per-

formed at the instance and with his knowledge of the decedent;" and that the plaintiff expected compensation for these services over and above room and board and the gratuities she received from Mr. Steffes.[2] These findings are significant because this court, in a long line of cases, has held that where services are performed at the special instance of the deceased and with his knowledge and are performed by the claimant with expectation of reasonable compensation, recovery may be allowed on the basis of a contract to pay, implied in fact or law.[3] The trial court concluded that a contract for services can be implied from the facts and can also be implied in law (quasi-contract) on the ground of unjust enrichment[4] and that plaintiff can recover the reasonable value of services rendered to the deceased.[5]

---

[2] No formal findings of fact were made in this case. However, the statements of fact appearing in the court's decision will be accorded the status of findings of fact. *Dombrowski v. Tomasino*, 27 Wis.2d 378, 386, 134 N.W.2d 420 (1965); *Stevens v. White Corp.*, 77 Wis.2d 64, 71, n. 3, 252 N.W.2d 88 (1977).

[3] *Estate of Voss*, 20 Wis.2d 238, 241, 121 N.W.2d 744 (1963); *Estate of Ansell*, 2 Wis.2d 1, 6, 85 N.W.2d 786 (1957); *Estate of Rosenthal*, 247 Wis. 555, 565, 20 N.W.2d 643 (1945); *Estate of St. Germain*, 246 Wis. 409, 411, 17 N.W.2d 582 (1945); *Kramer v. Bins*, 205 Wis. 562, 567, 238 N.W. 407 (1931); *Wojahn v. National Union Bank*, 144 Wis. 646, 129 N.W. 1068 (1911); *In Re Estate of Happel-Bossi*, 133 Wis. 119, 123, 113 N.W. 433 (1907).

[4] "When the parties express their agreement by words the contract is said to be express. When it is manifested by conduct it is said to be implied in fact . . . . A contract implied in law is not a contract at all but an obligation imposed by law to do justice even though it is clear that no promise was ever made or intended." Calamari & Perillo, *Contracts*, sec. 1–12, P. 19 (1977). *See Kramer v. City of Hayward*, 57 Wis.2d 302, 306–07, 203 N.W.2d 871 (1973); *Gerovac v. Hribar Trucking, Inc.*, 43 Wis.2d 328, 332, 68 N.W.2d 863 (1969); *Arjay Inv. Co. v. Kohlmetz*, 9 Wis.2d 535, 538–39, 101 N.W.2d 700 (1960); *Wojahn v. National Union Bank*, 144 Wis. 646, 666–667, 129 N.W. 1068 (1911).

[5] The trial court concluded that the reasonable value of the services was $20 per day, computed at $2 per hour, ten hours per day. Neither party challenges this figure.

The personal representative asserts that the evidence does not support the trial court's findings of fact that the services were rendered at the instance of and the knowledge of the decedent and with the expectation of compensation.

The personal representative's brief acknowledges that the plaintiff's services were performed with the knowledge of the decedent and that while he was ill in the hospital, he asked her to stay and asked her to help him so that he did not have to have a catheter. Nevertheless the personal representative argues that the trial court's finding that the services were performed at the deceased's instance and request cannot be sustained because the plaintiff moved to the home of the decedent and became a part of his household and family. The personal representative argues that because all services were performed as a member of the household the performance was not "at the decedent's instance and request" but was expected under the circumstances. The personal representative further argues that plaintiff's expectations were fulfilled when she was compensated by room, board, companionship, and gifts.

In effect the personal representative is asking this court to hold that, because the plaintiff was treated as a member of the household and performed services and because there was no direct evidence that the plaintiff was hired as a housekeeper, the trial court erred, as a matter of law, in concluding that the services were rendered at the decedent's instance and request. The personal representative cites no authority for this proposition of law, and we can find none.

In *Kramer v. Bins,* 205 Wis. 562, 238 N.W. 307 (1931), the claimant moved into the defendant's home and cared for him and his ailing father. The defendant alleged that the claimant performed services under an agreement that the parties would be  married later and that

the services were rendered without cost to the defendant. The claimant asserted that she performed services at his special instance and request and that she expected payment. The trial court submitted two questions, *inter alia,* to the jury: (1) Did the claimant render services to the defendant at the defendant's request, and (2) were the services rendered pursuant to a marriage agreement that each was to work for the other without pay? The jury concluded that the defendant had requested that services be rendered but that the parties had agreed that no compensation should be paid. This court upheld the verdict of the jury. There is nothing in the *Kramer v. Bins* opinion to indicate that services performed by a person who is treated as a member of the household but who was not hired as a housekeeper are, as a matter of law, expected and cannot, as a matter of law, be performed "at the instance and request" of the defendant. Indeed the opinion indicates that it is for the trier of facts to determine whether services of a person treated as a member of the household are performed at the request and special instance of the defendant and with the expectation of compensation.

In *Estate of Voss,* 20 Wis.2d 238, 121 N.W.2d 744 (1963), decedent advertised for a housekeeper and companion. A widow answered the advertisement, a period of courtship ensued, and there were discussions of marriage. The widow then moved into decedent's home and lived with him for four years, performing services first as his housekeeper and then as his practical nurse until his death. They never married and she never was paid. The trial court allowed her claim against the estate for the reasonable value of her services for the two years preceding Voss's death. In the *Voss* case the court found "positive evidence" that the services were performed at his request by the placement of the advertisement and her commencing services. However this court did not

hold that an advertisement seeking a housekeeper is the only evidence which can show that services were performed at decedent's request and with his knowledge or that there must be direct evidence that a person was hired as a housekeeper in order for the trier of facts to find that services were performed by that person at the decedent's request and with his knowledge.

We conclude there is no legal or factual basis to support the personal representative's argument that because plaintiff was treated as a member of the household the evidence does not support the trial court's findings that she went into Steffes' home as a housekeeper with the expectation of payment for services and that her services were rendered at the instance of the deceased and with his knowledge.

## III.

The personal representative next argues that the trial court erred in holding that the plaintiff could prevail on proof of an implied contract.[6] The trial court held in the instant case that there was a contract implied in fact and law to pay; it concluded that there was no express contract to pay the full value of the services rendered.[7]

We start with the principle well-grounded in human experience that where one renders valuable services for another payment is expected. This court has frequently stated that "if one merely accepts services from another which are valuable to him, in general, the presumption of fact arises that a compensation equivalent is to pass between the parties, and the burden of proof is upon the recipient of the service to rebut such presumption if he

---

[6] See note 4 supra.

[7] The trial court did not determine whether there was an express contract to pay less than full value for the services rendered.

would escape from rendering such equivalent." *Wojahn v. National Union Bank*, 144 Wis. 646, 667, 129 N.W. 1068 (1911).[8]

The personal representative's theory is that a presumption that the services were performed gratuitously applies in the instant case. Where there is a close family or marriage relationship, the law presumes the services are performed gratuitously, and the law will not imply from the mere rendition of services by one family member to another a promise to pay. This presumption of gratuitous service is, as is the presumption that services are rendered for compensation, well-grounded in human experience and rebuttable.[9] It is clear that the plaintiff is not related to the deceased by blood or marriage. The personal representative argues that the presumption of gratuitous service should apply anyway because the plaintiff was part of Steffes' family, the term "family" being used to include anyone who is a member of the household.[10] The basis for applying the presumption of gratuitous service to persons cohabiting but not related by marriage is that in the ordinary course of life persons living together in a close relationship perform services for each other without expectation of payment in the

[8] *See also, Estate of St. Germain*, 246 Wis. 409, 411, 17 N.W.2d 582 (1945); *Estate of Voss*, 20 Wis.2d 238, 242, 121 N.W.2d 744 (1963).

[9] *Estate of Goltz*, 205 Wis. 590, 594, 238 N.W. 374 (1931) and cases cited therein.

[10] For cases extending the presumption of gratuitous services to unmarried cohabitants, *see, e.g., Roznowski v. Bozyk*, 73 Mich. App. 405, 251 N.W.2d 606 (1977); *Lawrence v. Ladd*, 280 Ore. 181, 570 P.2d 638 (1977); *York v. Place*, 273 Ore. 947, 544 P.2d 572 (1975); *In re Gorden's Estate*, 8 N.Y.2d 71, 168 N.E.2d 239 (1960). *See also*, Annot., *Establishment of "Family" Relationship to Raise a Presumption That Services Were Rendered Gratuitously, As Between Persons Living in Same Household But Not Related By Blood Or Affinity*, 92 ALR3d 726, 743–45 (1979).

usual sense because the parties mutually care for each other's needs and perform services for each other out of a feeling of affection or a sense of obligation.

The personal representative asserts that the law in Wisconsin is that if a presumption of gratuitous service applies, the party seeking compensation must prove the existence of an *express* contract for compensation.[11] The personal representative relies on *Estate of Goltz*, 205 Wis. 590, 594, 238 N.W. 374 (1931), in which this court said:

"The law is well established that 'where near relatives by blood or marriage reside together as one common family, and one of them renders services to another, and such other furnishes him board and lodging or other necessaries or comforts, a presumption arises that neither party intended to receive or to pay compensation for the services rendered on the one hand, or for the board and lodging or other necessaries or comforts on the other; that they were intended as mutual acts of kindness done or furnished gratuitously.' *Estate of Kessler*, 87 Wis. 660, 664, 59 N.W. 129; *Schmidt's Estate*, 93 Wis. 120, 67 N.W. 37; *Williams v. Williams*, 114 Wis. 79, 89 N.W. 835; *Estate of Skinner*, 189 Wis. 390, 207 N.W. 942.

". . .

"Since the facts of this case bring it within the rule stated and give rise to the presumption of gratuitous services, it was incumbent upon the claimant to prove an express contract by direct and positive evidence or to prove by unequivocal facts and circumstances that which is the equivalent of direct and positive proof of an express contract. *Hall v. Finch*, 29 Wis. 278; *Tyler v. Burrington*, 39 Wis. 376; *Pellage v. Pellage*, 32 Wis. 136; *Leitgabel v. Belt*, 108 Wis. 107, 83 N.W. 1111."

Cases decided by this court since *Goltz* have departed from the principle that a presumption that services were

---

[11] For cases involving proof of an express contract, *see Estate of Rienow*, 16 Wis.2d 403, 114 N.W.2d 840 (1962); *Estate of Clark*, 221 Wis. 569, 267 N.W. 273 (1936); *Estate of Ghent*, 217 Wis. 631, 259 N.W. 865 (1935).

■

rendered gratuitously may be rebutted only by proof of an express contract. This court has upheld judgments awarding compensation on the basis of a contract implied in fact even though the claimant was related to the decedent by blood or marriage.

We do not think it is necessary in the instant case to determine whether a presumption of gratuitous service arises where persons live in the same household in a meretricious relationship, because whether the initial presumption is that services were to be compensated or that they were rendered gratuitously, the final determination of whether the services were to be compensated depends on the circumstances relating to the plaintiff's entry into and her stay in the Steffes' household.[12] If an express promise to pay is proved or a promise to pay can be implied from the facts, then the plaintiff is entitled to compensation regardless of the fact that she rendered services with a sense of affection, devotion and duty.

■

As we explained in *Estate of Detjen*, 34 Wis.2d 46, 52–53, 148 N.W.2d 745 (1967):

". . . And, whatever the initial presumptions may be, the final determination, we have said in the *Estate of Kuepper* (1961), 12 Wis. (2d) 577, 107 N. W. (2d) 621, depends not on a rule of law which awards or denies

---

[12] Sec. 903.01, Rules of Evidence, provides:

"**Presumptions in general.** Except as provided by statute, a presumption recognized at common law or created by statute, including statutory provisions that certain basic facts are prima facie evidence of other facts, imposes on the party relying on the presumption the burden of proving the basic facts, but once the basic facts are found to exist the presumption imposes on the party against whom it is directed the burden of proving that the non-existence of the presumed fact is more probable than its existence."

*See* Judicial Council Committee's Note, 59 Wis.2d R 49, 51, for a discussion of the procedure for application of the presumptions.

compensation for services rendered depending on the family relationship of the parties or the house they live in, but upon the existence or nonexistence of an express promise, or one implied in fact, that the services were to be paid for.

"In respect to the payment of decedent's debts in her lifetime, when there is no express promise of repayment, one may be implied or negated in fact from the conduct of the parties, the nature of the bill, the amount of payments, the relationship and affection or lack of it between the parties, and whether such payments are usually made under such circumstances as to indicate or negate a promise of repayment. Thus the circumstances may support a presumption or an inference of an implied promise or negate its existence, but whatever the direct evidence is and whatever inferences may be drawn from other evidence, the burden of proving an implied agreement existed between the claimant and the decedent falls upon the claimant. *Estate of Kuepper, supra; Wojahn v. National Union Bank* (1911), 144 Wis. 646, 129 N. W. 1068; *Estate of St. Germain* (1945), 246 Wis. 409, 17 N. W. (2d) 582."

In the case at bar the plaintiff had been employed in a tavern when she met the deceased. The trial court concluded that she left a paying job to take care of deceased's home; that she went to the deceased's farm and performed labor usually performed by a housekeeper, farm-hand, mason, carpenter, bookkeeper and nurse; and that she worked long and hard doing heavy work and performing unpleasant tasks. She testified she expected compensation. Witnesses testified that the decedent said he wanted to leave real estate to her and wanted to provide for her.[13] Several of the services plaintiff per-

---

[13] "[A] verbal promise to make provision by will in consideration of the services or support, though it relates to real estate and is void under the statute of frauds as far as specific enforcement is concerned, will nevertheless suffice to rebut the presumption that the services were gratuitous, permitting recovery on quantum meruit. The promise or intention need not be particularly definite. The object is to combat the presumption of gratuitousness. If this

formed were of a commercial variety, and the deceased hired employees to perform services similar to those rendered by the plaintiff.

The trial court in the instant case carefully reviewed the relation and situation of the parties, the nature and character of the services rendered, and all the facts and circumstances and concluded that the plaintiff entered this home and remained there as a housekeeper for the deceased; that although there was a warm and affectionate relation between the plaintiff and the deceased and the deceased made gifts to the plaintiff, the plaintiff expected payment for the services and the deceased expressed his intent to provide for the plaintiff; and that an agreement between the plaintiff and the deceased that he would pay for such services can be implied from the circumstances.

The trial court's conclusion in the case at bar is consistent with prior decisions of this court holding that under the facts of the particular case an implied promise to pay for services was proved. In *Estate of Voss*, 20 Wis.2d 238, 121 N.W.2d 744 (1963), which we discussed previously, the claimant, who was not related to the deceased by blood or marriage moved into the decedent's home and performed household services for him expecting marriage between herself and the deceased. This court refused to say that there was any "relationship between them whereby either party should consider her services to Mr. Voss as housekeeper and companion were given gratuitously." We viewed the facts in *Voss* as sufficient to raise the presumption that compensation was expected.

In *Estate of Anderson*, 242 Wis. 272, 7 N.W.2d 823 (1943), the deceased asked his ex-wife to allow him

can be done, there is a right of recovery, with such matters as amount, terms, and legal basis determinable under general principles of law." 2 MacDonald, *Wisconsin Probate Law*, sec. 9.140, p. 49. (Citations omitted.) (7th ed. 1972).

to make his home with her again. She did, but they did not remarry. The court said "They lived as a family thereafter as they had theretofore." The deceased's will left all the property to the deceased's sister, and the ex-wife filed a claim against the estate for services rendered from December 1928 through June 1940. This court held that there was enough evidence in the case to rebut the presumption that the ex-wife's services were rendered gratuitously and held that the ex-wife could recover on an implied contract for the value of services rendered within the period not barred by the statute of limitations.[14]

In *Estate of Grossman,* 250 Wis. 457, 461, 27 N.W.2d 365 (1947), a father requested an adult daughter who lived 100 miles from the parents' home to come to her parents' home and help care for her ailing mother. After the mother died, the father became ill, and the daughter again left her job and home to return to the parents' home to care for the father. The daughter sought reasonable compensation for these services from the father's estate. She did not prove an express contract for payment. Noting that the intention of the parties may be gathered from the acts, deeds and words of the parties and the surrounding circumstances, this court concluded that the daughter's evidence, although "not too strong," was "sufficient to overcome the presumption [that the services were gratuitously performed] and sustain the trial court in granting judgment for the services rendered. . . ."

In *Kramer v. Bins,* 205 Wis. 562, 278 N.W. 307 (1931), which we discussed previously, it was for the trier of

---

[14] *Cf. Estate of Fox,* 178 Wis. 369, 190 N.W. 90 (1922), in which this court allowed a woman who was fraudulently led to believe she was lawfully married to the deceased to recover from his estate on the implied promise to pay for services rendered within the period not barred by the statute of limitations.

fact to determine whether the services of the claimant who moved into the household upon a promise to marry were rendered with the expectation of compensation. *See also Estate of Reynold,* 24 Wis.2d 370, 375, 129 N.W.2d 251 (1964), for a discussion of evidence indicating whether the furnishing of services was gratuitous in a family unit.

We hold that there is sufficient evidence in the case at bar to support the trial court's finding that there was an implied promise to pay for the services plaintiff rendered.

## IV.

The personal representative's final argument is that because the plaintiff voluntarily and knowingly lived in an adulterous relationship with the decedent she cannot recover on implied contract for her household, farm or nursing services.

In support of its contention, the estate quotes the following language from *Estate of Fox,* 178 Wis. 369, 371, 190 N.W. 90 (1922) :

"Courts are practically unanimous in holding that when a woman voluntarily and knowingly lives in illicit relations with a man, she cannot recover on implied contract during the period of such relationship."

This language was *obiter dicta.* In the *Fox* case, this court permitted a woman who in good faith believed she was married to a man, though she was not, to recover for services rendered during the illicit relationship. Our court refused to adopt the harsh Massachusetts rule that the woman could not recover because the law can imply no agreement when no compensation was contemplated by the parties. Instead, our court held that

the determination of whether a woman who lived in an illegal relationship with a man could recover from the man on the theory of implied contract turns on the equities of the situation. In the *Fox* case we held that the woman could recover under a theory of implied contract because denying recovery would unjustly enrich his estate at her expense. We said "equity demands that she shall be made whole . . . . It is inferred from the nature of the transaction, and the supposed husband is held to have assumed to pay because in point of law and equity it is just that he should pay."

The trial court in the case at bar looked at the equities and decided that unless plaintiff was compensated for her services the Steffes' estate would be unjustly enriched. The trial court concluded that fairness and justice required that her claim be paid. The trial court stated:

". . . I don't think that there is a person that could sit here in the courtroom today and listen to what I heard too today and listen to all the work that Mary Lou Brooks did for Virgil Steffes during his lifetime and conclude that anything other than that estate has been enriched by reason of her services. Had he hired somebody to do this he would have had to pay them for that and to the extent that he has not paid for those services that estate has been enriched. He was just as much a party to the illicit relationship as this lady was. The question I have in mind is why should the estate be enriched when that man was just as much a part of the illicit relationship as she was and not let her have her fair dues. I don't understand that law that would interpret unjust enrichment that way and deprive one and let the other benefit and do it on the basis that there was an illicit relationship but not equally held against the both. . . ."

The personal representative also cites *Smith v. Smith,* 255 Wis. 96, 100, 38 N.W.2d 12 (1949), to support his assertion that the plaintiff be denied compensation by

reason of the illegal relationship between the plaintiff and the deceased. In *Smith* the woman, apparently unaware that common-law marriages were invalid in Wisconsin, lived with Mr. Smith ostensibly as husband and wife for more than six years. During that period the parties pooled their labor and earnings. When the woman discovered that the couple was not married, he refused to marry her. She sued him, not for compensation for services, but for an equitable division of the property acquired while they were living together. The court held against the woman reasoning that the couple was not married and that accordingly the rules of law relating to division of marital property were not applicable.[15]

---

[15] In recent years there have been a number of cases in other jurisdictions involving the property rights of the parties upon termination of their cohabitation without marriage. *See, e.g., Marvin v. Marvin*, 18 Cal.3d 660, 134 Cal. Rptr. 815, 557 P.2d 106 (1976); *McCullon v. McCullon*, 410 N.Y.S.2d 226 (1978); *Hewitt v. Hewitt*, 62 Ill. App.3d 861, 380 N.E.2d 454, (1978); *Carlson v. Olson*, 256 N.W.2d 249 (Minn. 1977). For a discussion of issues raised in these cases, *see, e.g.,* Marderosian, *The Property Rights of Unmarried Cohabitants—A Proposal,* 14 Calif. W.L. Rev. 485 (1979); Kay & Amyx, *Marvin v. Marvin: Preserving the Options,* 65 Calif. L. Rev. 937 (1977); Folbey & Buren, *Domestic Partnership: A Proposal for Dividing the Property of Unmarried Families,* 12 Willamette L. J. 453 (1976); Bruch, *Property Rights of De Facto Spouses Including Thoughts on the Value of Homemakers' Services,* 10 Fam. L. Q. 101 (1976); Weitzman, *Legal Regulation of Marriage: Tradition and Change,* 62 Calif. L. Rev. 1169 (1974).

The plaintiff in this case does not, on the ground of cohabitation, seek property rights granted married persons. The relevance of the parties' cohabitation in the instant case is to the question of whether there is a presumption of payment for services or a presumption of gratuitous services and to the question of whether the court will render relief in a claim for compensation for services in which there is an acknowledged "meretricious" relationship. *See* Annot., *Recovery for Services Rendered by Persons Living in Apparent Relation of Husband and Wife Without Express Agreement for Compensation,* 94 A.L.R.3d 552 (1979).

The court treated the parties as it treated business partners who enter into an illegal contract: where parties assert "rights founded upon an illegal and void contract . . . a court of equity leaves the parties to such a situation just where they placed themselves and as the court found them. Its doors are closed to any applicant for relief from or under such a contract."

In *Smith* the court held against the claimant because

"[I]t is clear that whatever rights she seeks to enforce in this action arise solely by reason of the illegal relationship. Since she was aware of all the facts which make the contract illegal, she cannot be excused for lack of knowledge of the law. The action being one for equitable division of the property of the parties and being based upon an illegal contract of marriage, the demurrer should have been sustained." 255 Wis. at 100.

We need not consider the rule enunciated in *Smith* because the *Smith* case is inapposite. In the instant case, unlike in *Smith,* the plaintiff does not seek an equitable division of property. She seeks compensation for services lawfully rendered; she does not base her claim on an illegal relationship, on a marital right, on a "quasi-marital right" or on a partnership theory.

The trial court considered the *Smith* case and distinguished it from the instant case on the facts of the two cases. In this case the trial court found that the plaintiff's household, farm and nursing services were provided with the expectation of compensation and that these services were separate from and not based upon an illegal or illicit arrangement. The trial court stated:

"[T]here is no evidence here before me at least that there was any agreement by this lady to engage in sexual relations as in return for being hired there for housekeeping services and those relationships that subsequently took place but which I might add here ceased during the last year of his life. I don't know that there is proof that they continued throughout the relationship or

throughout the two year period in question. The testimony is that they did not, but they did take place and I don't believe that those relationships should bar this lady's action for the services that she rendered and for which she has not been compensated. . . . There is no evidence at all that the arrangement that was entered into between Steffes and Brooks was anything other than a proper arrangement. I would have to speculate one way or the other and what we do know is that she took on these services with him, left her home and two children, and left it according to her testimony with a good feeling between her and her husband and to the point that they are still friends and he was contributing money and gave her money while she was living there. You could just as easily assume that there was no illicit relationship when these services commenced. Services therefore were not based upon an illegal or illicit arrangement that developed. . . . Well, the last page [in the *Smith* case] is where they say they're ruling and they said, 'It's clear that whatever rights she seeks to enforce in this action arise solely by reason of the illegal relationship.' Now, that's a great of difference between what existed there and what exists here. There just is no showing that in this case the rights that this lady seeks to recover or enforce arose solely by reason of any illicit relationship. In fact, the evidence in my opinion would be to the contrary. There is no evidence that these people romanced ahead of time or contemplated any type of romance or any relationship while the services were being rendered. So I fail to see as I said earlier the Smith case in any way changes my opinion, that they said this lady was aware of sufficient facts from which she should have been able had she known the law to conclude that the relationship, the marriage that was contracted was illegal and she is not excused by reason of ignorance of the law. It was illegal and she bases her entire claim on that illegal contract. She said she could not do so and that is not in my opinion the case before us here. Now then, I am going to conclude that this lady is entitled to recover for her services and I base that conclusion on my findings that the services rendered by her were performed at the instance of and with the knowledge of the decedent, Mr. Steffes. We have a lot of talk about her expectations to compensation."

A rationale similar to the one set forth by the trial court in the case at bar was used in *Green v. Richmond,* 369 Mass. 47, 337 N.E.2d 691 (1975), to award compensation to a woman on an express oral contract to pay for services rendered. In *Green,* the estate argued that the claimant could not recover from the estate the reasonable value of her housekeeping services because sexual intercourse between the parties was within the scope of their express oral agreement; that the claimant's illegal activities were not merely incidental to the other services performed under their agreement; and that public policy considerations forbade allowing recovery by the plaintiff. The Massachusetts trial court submitted the issue of illegality, both as to the content of the agreement and the nature of the claimant's performance, to the jury. The jury found for the claimant. The Supreme Judicial Court of Massachusetts affirmed the judgment for the claimant, concluding that the interpretation of the parties' agreement and the determination of the nature of the claimant's performance of the contract were questions for the trier of fact, and the jury was warranted in concluding that the illicit relationship was incidental to the agreement and the claimant's performance thereof. Accordingly, the Massachusetts court held that public policy did not require that the plaintiff forego compensation for services lawfully rendered.

We conclude that the trial court's reasoning in the instant case is sound.[16] Although the oft quoted rule is

[16] *Cf. In re Estate of Thornton,* 81 Wn.2d 72, 499 P.2d 864 (1972).

*Compare McCall v. Frampton,* 415 N.Y.S.2d 752 (1979), where the court refused to allow the woman to recover for breach of contract or to impose a constructive trust in her favor on real estate. The court held that the contract pleaded in the complaint is void and unenforceable as a matter of public policy because the consideration for the agreement was her commission of adultery.

that a court will not grant a remedy to parties to an illegal contract,[17] there are many exceptions and limitations to the rule.[18] One limitation or exception to the

[17] One court commented on the doctrine of not aiding the parties to an "illegal bargain" involving a meretricious relationship as follows:

"[T]his court and the courts of other jurisdictions have, in effect, sometimes said, 'We will wash our hands of such disputes. The parties should and must be left to their own devices, just where they find themselves.' To me, such pronouncements seem overly fastidious and a bit fatuous. They are unrealistic and, among other things, ignore the fact that an unannounced (but nevertheless effective and binding) rule of law is inherent in any such terminal statements by a court of law.

"The unannounced but inherent rule is simply that the party who has title, or in some instances who is in possession, will enjoy the rights of ownership of the property concerned. The rule often operates to the great advantage of the cunning and the shrewd, who wind up with possession of the property, or title to it in their names, at the end of a so-called meretricious relationship. So, although the courts proclaim that they will have nothing to do with such matters, the proclamation in itself establishes, as to the parties involved, an effective and binding rule of law which tends to operate purely by accident or perhaps by reason of the cunning, anticipatory designs of just one of the parties." *West v. Knowles,* 50 Wash.2d 311, 315–16, 311 P.2d 689 (1957).

[18] "There are many varieties and degrees of 'illegality' and these varieties and degrees must be taken into account in determining the juristic effect of a transaction that involves some form of illegality." 6A Corbin, *Contracts,* sec. 1534, p. 816 (1962).

This court has held that even if a contract is made in violation of an express statute it is not necessarily void. "Not all contracts made in violation of the provision of a statute are void. *Chapman v. Zakzaska,* 273 Wis. 64, 76 N.W.2d 537. In determining whether such a contract is void, this court has observed that the intent and purpose of the objectives of the legislature must be ascertained. *Posnanski v. Hood,* 46 Wis.2d 172, 174 N.W.2d 528 (1970)." *Vic Hansen & Sons, Inc. v. Crowley,* 57 Wis.2d 106, 116–117, 203 N.W.2d 728 (1973).

For a discussion of the enforceability of contracts in violation of the law of crimes or torts or contrary to public policy, see 6A Corbin, *Contracts,* chs. 51 and 52 (Jaeger 3d ed. 1972); and Restatement, *Contracts,* ch. 18 (1932).

rule that the law will not grant a remedy to parties to an illegal contract is that a bargain between two people is not illegal merely because there is an illicit relationship between the two so long as the bargain is independent of the illicit relationship and the illicit relationship does not constitute any part of the consideration bargained for and is not a condition of the bargain.[19]

Sec. 589 of the Restatement of Contracts (1932) states the rule and the exception as follows: "A bargain in whole or in part for or in consideration of illicit sexual intercourse or of a promise thereof is illegal; but subject to this exception such intercourse between parties to a bargain previously or subsequently formed does not invalidate it."

In the case at bar the trial court found that the illicit relationship was incidental to the plaintiff's performance of lawful services and was not a condition of nor a consideration for the deceased's implied promise to compensate. In view of the trial court's findings and the facts of this case, we conclude that it is not contrary to public policy to permit the plaintiff to recover the rea-

Comment *b* to sec. 320, Restatement (Second) of Contracts, Tentative Draft No. 12 (March 1, 1977), explains that a court's decision as to the enforceability of an agreement on the grounds of illegality and public policy is reached "only after a careful balancing, in the light of all the circumstances, of the interest in the enforcement of the particular promise against the policy against the enforcement of such terms. . . . Only if the factors that argue against enforcement clearly outweigh the law's traditional interest in protecting the expectations of the parties, its abhorrence of any unjust enactment, and any public interest in the enforcement of the particular term will enforcement be denied."

[19] 6A Corbin, *Contracts*, sec. 1476, p. 622 (1962); 15 Williston, *Contracts*, sec. 1745 (Jaeger 3d ed. 1972); *Schara v. Thiede*, 58 Wis.2d 489, 495, 206 N.W.2d 129 (1973).

sonable value of the lawful services performed for the deceased.

For the foregoing reasons, we affirm the judgment of the trial court.

*By the Court.*—Judgment affirmed.

HANSEN, J., took no part.

COFFEY, J. *(dissenting)*. The plaintiff, Mrs. Brooks, left her husband and two children to live in an adulterous relationship with the deceased, a much older man who was also married. They maintained an intimate sexual relationship until his health no longer permitted it. The "services" she performed for the deceased were owed to her husband under her solemn marriage vows. After the deceased became ill, she took care of him and performed some of the farm work. But this was not a separate undertaking. It was a continuation of the meretricious relationship she had established earlier.

The majority claims that Mrs. Brooks provided the decedent with "excellent nursing care during his lengthy last illness." Moreover, they claim that the decedent's son testified that when he visited his father's home he found it was kept in good condition and that Mrs. Brooks was taking good care of his ill father. I find, after a thorough examination of the record, no evidence to substantiate the majority's opinion that Mrs. Brooks provided "excellent nursing care," but rather she provided "intermediate care" as he was not totally independent in taking care of his own needs. Secondly, the record also fails to substantiate that the decedent's son testified that Mrs. Brooks "took good care of his ill father," but rather he testified as follows:

"*Q.* And what's the condition of the house when you were here?

"*A.* It was in good shape.

"*Q.* And did she cook meals for you at that time?

"*A.* Yes.

"*Q.* And your father?

"*A.* Yes.

"*Q.* When was the last time that you saw your father?

"*A.* I saw him about the first week in May of 1976.

"*Q.* And that was at his home?

"*A.* Right, that was at the south house.

"*Q.* And did you observe Mary Lou Brooks do anything for him at that time?

"*A.* Yes, I did.

"*Q.* And what did she do?

"*A.* She cooked dinner and she cooked meals for us.

"*Q.* Did she assist him in any way in getting around?

"*A.* She prepared his food for him and gave him a fork and he ate with his left hand.

"*Q.* Did she have to help him walk?

"*A.* No, not on that date.

"*Q.* He was able to walk all by himself?

"*A.* Yes."

Out of a misguided sense of fairness, the author of the majority opinion implies a promise to pay from the "circumstances relating to the plaintiff's entry into and her stay in the Steffes household." I have examined the circumstances cited and can only reach the conclusion that sexual intimacy, in violation of their marriage vows, was the underlying motivation for Mrs. Brooks' entry into and stay in the home of the deceased. In *Estate of Fox,* 178 Wis. 369, 190 N.W. 90 (1922) this court said that:

"Courts are practically unanimous in holding that when a woman voluntarily and knowingly lives in illicit relations with a man she cannot recover on an implied contract for services rendered him during the period of such relationship. 29 L.R.A.n.s. 787." *Id.* at 371.

The majority opinion says Mrs. Brooks testified she expected compensation. I disagree. Her actual testimony was as follows:

"*Q.* Did you receive any wages from Mr. Steffes?

"*A.* No sir.

*"Q.* From July of '74 until his death?

*"A.* No sir.

*"Q.* Did you expect to receive any money for the work that you did?

*"A.* No.

*"Q.* Pardon?

*"A.* No, but he always told me that—

*"By Mr. Antoine:* I would object to what he said. That's hearsay and she's not competent to testify to it.

*"By the Court:* I'll sustain the objection.

*"By Mr. Urban:*

*"Q.* Did you understand that question?

*"A.* No.

*"Q.* Let me ask you differently. Did you expect to receive anything for the services you performed for Virgil Steffes from July 17, 1974, until the time of his death?

*"By Mr. Antoine:* Object to that. It's already been answered.

*"By the Court:* No, the previous question was a little different. The other question was, do you expect to receive any money, and this question is, do you expect to receive anything, and that's a different question. Answer the question.

*"A.* Yes."

In *Estate of Detjen,* 34 Wis.2d 46, 148 N.W.2d 745 (1967) this court held that:

"Whether the claim involves services rendered to the decedent or payments made for her benefit, the foundation for recovery generally is the same—a contract express or implied. And, whatever the initial presumptions may be, the final determination, we have said in the *Estate of Kuepper* (1961), 12 Wis. (2d) 577, 107 N.W. (2d) 621, depends not on a rule of law which awards or denies compensation for services rendered depending on the family relationship of the parties or the house they live in, but upon the existence or non-existence of an express promise, or one implied in fact, that the services were to be paid for." *Id.* at 52, 53.

Furthermore, in *In the Matter of Guardianship of Kordecki,* 95 Wis.2d 275, 290 N.W.2d 693 (1980) this court,

quoting from *Estate of Detjen, supra,* held, with regard to the general rule of implied-in-fact contracts, that:

". . . a promise to pay will not be implied if a benefit is conferred with no expectation of payment but is conferred from motives of friendliness, neighborliness, kindliness or charity." *Id.* at 280.

In this case, Mrs. Brooks did not expect to be paid, although it should be pointed out that Mrs. Brooks did not go uncompensated, she received clothing, board, food, lodging, plus $7,200 from the sale of horses and cattle and $3,200 towards the purchase of a car while living with the deceased. She expected the deceased to leave her the farm, but he sold it before his death and did not leave her the proceeds. Of this fact she was well aware, but still did not leave and return to her husband and children she had abandoned. Now the majority gives her money compensation she never expected as a consolation prize. The amount of money compensation that the majority awards to the plaintiff is minor in comparison to the total value of the decedent's gross estate. However, the fact that the plaintiff's recovery is small when compared to the gross value of the estate does not support the court's holding because the total value of the estate is immaterial. Likewise, the amount of money taken in an armed robbery or the amount of money obtained in a check forgery scheme are immaterial, but the underlying principle of law is this court's granting of a consolation prize to a woman who has abandoned her family and entered an adulterous relationship with a married man in violation of the laws of this state. In affirming the trial court's award of $14,600 from the estate to Mrs. Brooks, are we not depriving the decedent's lawful heirs, his children, of their just and complete inheritance? Is she also allowed to inherit from her own lawful husband should he predecease her

and before a lawful divorce? Is she entitled to her dower-elective share rights? Within the past six months, the Illinois Supreme Court, when confronted with a similar problem, commented in *Hewitt v. Hewitt,* 77 Ill.2d 49, 394 N.E.2d 1204 (1979) as follows:

"The issue of unmarried cohabitants' mutual property rights, however, as we earlier noted, cannot appropriately be characterized solely in terms of contract law, nor is it limited to considerations of equity or fairness as between the parties to such relationships. There are major public policy questions involved in determining whether, under what circumstances, and to what extent it is desirable to accord some type of legal status to claims arising from such relationships. Of substantially greater importance than the rights of the immediate parties is the impact of such recognition upon our society and the institution of marriage. Will the fact that legal rights closely resembling those arising from conventional marriages can be acquired by those who deliberately choose to enter into what have heretofore been commonly referred to as 'illicit' or 'meretricious' relationships encourage formation of such relationships and weaken marriage as the foundation of our family-based society? In the event of death shall the survivor have the status of a surviving spouse for purposes of inheritance, wrongful death actions, workmen's compensation, etc.? And still more importantly: what of the children born of such relationships? What are their support and inheritance rights and by what standards are custody questions resolved? What of the sociological and psychological effects upon them of that type of environment? Does not the recognition of legally enforceable property and custody rights emanating from nonmarital cohabitation in practical effect equate with the legalization of common law marriage—at least in the circumstances of this case? And, in summary, have the increasing numbers of unmarried cohabitants and changing mores of our society . . . reached the point at which the general welfare of the citizens of this State is best served by a return to something resembling the judicially created common law marriage our legislature outlawed in 1905?" *Id.* at 1207–08.

In the case at bar, there could not be a common-law marriage without a lawful divorce. Mrs. Brooks and the deceased were content to maintain their prior marital status while living together in open defiance of their vows and the laws of the state of Wisconsin. This court ought not to allow Mrs. Brooks to assert a right to compensation growing out of a relationship which offends the standards of decency of any age. Their lifestyle has not been condoned, but has been rejected by our legislature. Moreover, the majority's decision contravenes the intent and policy of "The Family Code" of this state as recited in sec. 245.001(2), Stats., which reads in part as follows:

"(2) INTENT. It is the intent of chs. 245 to 248 to promote the stability and best interests of marriage and the family. Marriage is the institution that is the foundation of the family and of society. Its stability is basic to morality and civilization, and of vital interest to society and the state. The consequences of the marriage contract are more significant to society than those of other contracts, and the public interest must be taken into account always. . . ."

The majority, in its opinion, cites a California Supreme Court case, *Marvin v. Marvin*, 18 Cal.3d 660, 134 Cal. Rptr. 815, 557 P.2d 106 (1976), as establishing the existence of certain mutual property rights between parties living together outside of marriage. California, unlike Wisconsin, has repealed its statute imposing criminal sanctions for sexual activity between unmarried, consenting adults. Thus, in California there is no barrier to adults living together out of wedlock. However, where a state has established a statutory barrier to cohabitation between unmarried adults that law should be given full force and effect and not be undermined. Attempts have been made in Wisconsin, in fact as recently as the current legislative session to abolish or eliminate the

statutory barrier preventing consenting adults who are married to another person from living together and engaging in adulterous behavior but these attempts have been unsuccessful. In a recent tax case, *Ensminger v. Commissioner of Internal Revenue*, 610 F.2d 189 (1979) the 4th Circuit Court of Appeals held that a taxpayer could not claim as a dependent a 21 year old woman, not his wife, with whom he lived and supported because their relationship "was in violation of local law." In that case North Carolina had a statute holding that lewd and lascivious cohabitation between a man and woman not married to each other was a misdemeanor. The court also stated that:

"The regulation of marriage, family life and domestic affairs 'has long been regarded as a virtually exclusive province of the states.' " *Id.* at 191.

I believe the majority has resorted to an unfortunate form of judicial surgery that can only serve to accelerate the growth of the self-destructive cancer of the '70's "immorality" and the decline of the family. If there is to be a direct, frontal assault on the traditional values, principles, ideals and pattern of family life, the very lifeline and backbone of our American society, it should be accomplished within the confines of the legislative halls—not in the courts. The judicial system is ill equipped to deal with a social change of this magnitude because we are without the benefit of up-to-date economic, social and psychological data in the field of domestic relations and the far reaching implications of court approved abandonment and the problems accompanying fatherless and motherless children in the decades ahead. With this decision are we not condoning abandonment? broken homes? Are not 95% of all juvenile law violators from broken homes? Are not by

far the vast majority of welfare problems directly attributable to abandonment? If there is a need for a change in this far reaching public policy question, and I fail to see the necessity, let it be done after a legislative fact-finding hearing where a more thorough discussion can only lead to greater knowledge and expertise in the solving of this most delicate question. The Illinois Supreme Court in *Hewitt v. Hewitt, supra,* held that the decision of whether the present law should be changed so as to grant legal rights or status to a non-marital relationship, such as existed in this case, is best left to the legislature:

". . . The question whether change is needed in the law governing the rights of parties in this delicate area of marriage-like relationships involves evaluations of sociological data and alternatives we believe best suited to the superior investigative and fact-finding facilities of the legislative branch in the exercise of its traditional authority to declare public policy in the domestic relations field." *Id.* at 1209.

Therefore, I would reverse.