John DOE

v.

John BURKLAND.

No. 2001–95–Appeal.

Supreme Court of Rhode Island.

Nov. 12, 2002.

Jeffrey H. Gladstone, Providence, for Plaintiff.

Dean J. Wagner, Daniel V. McKinnon, Pawtucket, Joseph Anthony DiMaio, Providence, for Defendant.

Present: WILLIAMS, C.J., LEDERBERG, FLANDERS, and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

This is a dispute between two men who lived together as domestic partners for approximately nine years before their relationship soured and ended on bad terms. Thereafter, one of them (the plaintiff, "John Doe")[1] filed a Superior Court lawsuit seeking injunctive relief against the defendant, John Burkland (Burkland), his former cohabitant, to stop Burkland's alleged harassment and threats.[2] Burkland responded by not only denying any harassment or threatening conduct, but also by filing counterclaims. He alleged, among other causes of action, breach of an oral agreement with the plaintiff to share equally any property that either of them had acquired individually during their cohabitation. Burkland's counterclaims also included allegations asserting breach of an express and implied contract, promissory estoppel, constructive trust, resulting trust, and unjust enrichment. Eventually, however, a Superior Court motion justice dismissed them all under Rule 12(b)(6) of

1. Although plaintiff originally filed suit in Superior Court using his real name, after defendant appealed from the judgment dismissing his counterclaims, plaintiff moved this Court for permission to use the pseudonym "John Doe." But we remanded the case to the Superior Court so that it could consider this motion in the first instance. The Superior Court then granted the motion and allowed plaintiff to litigate under the pseudonym "John Doe." In granting the motion, the Superior Court also ordered the parties to redact plaintiff's name from all pleadings and to substitute the pseudonym "John Doe" for his real name. Consequently, in response to defendant's objections to this ruling, we requested the parties to brief and argue its propriety as part of this appeal. We address the merits of this question at the end of this opinion.

2. The plaintiff also sought and obtained a no-contact restraining order against defendant. With the consent of the parties, the court later converted this order into a preliminary injunction.

the Superior Court Rules of Civil Procedure, concluding that they failed to state a claim upon which relief could be granted. She ruled that the counterclaims in question arose out of a course of conduct and a series of alleged agreements that centered on a "meretricious" relationship between the plaintiff and Burkland. Because Rhode Island law does not recognize "a marital dissolution between unmarried couples, homosexual or heterosexual," she decided that the counterclaims were not viable. The court then entered a final judgment in favor of the plaintiff under Rule 54(b) (allowing for entry of a final judgment for less than all the parties or all the claims when the court makes the requisite findings), from which Burkland, the would-be counterclaimant, duly appealed.

A single justice of this Court ordered the parties to show cause why we should not decide the appeal summarily. After considering the parties' written and oral submissions, we conclude that we can decide the appeal at this time without further briefing and argument. Because the motion justice considered factual matters beyond the pleadings in dismissing Burkland's contentions, and because she ignored the valid consideration alleged for the property-sharing agreement averred in the counterclaims, we reverse and vacate the order and judgment dismissing these claims.

## Motion to Dismiss

■ A motion to dismiss under Rule 12(b)(6) should be granted only when it is clear beyond a reasonable doubt that the party opposing the motion would not be entitled to relief under any set of facts that

could be adduced in support of the claim. *Bruno v. Criterion Holdings, Inc.*, 736 A.2d 99, 99 (R.I.1999) (mem.) (citing *Folan v. State DCYF*, 723 A.2d 287, 289 (R.I. 1999)). On appeal, we review a motion justice's decision to dismiss a claim under Rule 12(b)(6) by accepting the allegations of the nonmoving party as true and by viewing them in the light most favorable to that party. *Id.*

■ The motion justice dismissed the counterclaims because, she concluded, they arose out of a "meretricious" relationship between the parties, who were once a cohabiting, homosexual couple. She reasoned that contracts based on or arising out of "meretricious" relationships are void as against public policy. Burkland's counterclaims, however, did not allege that the parties' sexual relationship constituted the consideration for their putative property-sharing agreement. Indeed, the counterclaims contain no reference to the existence of any sexual relationship whatsoever between the parties, much less that it constituted, in whole or in part, the consideration for the alleged property-sharing agreement.[3] Rather, the counterclaimant alleged that he agreed to "devote his skills, effort, labors and earnings" to assist plaintiff in his career, and that he provided homemaking services, business consulting, and counseling to plaintiff in consideration for the alleged property-sharing agreement. If it were proven to be so, then such consideration would not be illegal—irrespective of the fact that the parties may have been living together when they entered into the contract. *Boland v. Catalano*, 202 Conn. 333, 521 A.2d 142, 145

---

**3.** The counterclaimant alleged that his relationship with plaintiff was an "intimate, personal, meaningful and confidential relationship," and that the parties had registered as domestic partners pursuant to the municipal laws of New York City. Although these allega-

tions indicate that some form of intimate relationship existed between the parties during the time that they lived together, it does not aver that a sexual relationship was the basis, in whole or in part, for the alleged property-sharing agreement.

(1987) ("Ordinary contract principles are not suspended * * * for unmarried persons living together, whether or not they engage in sexual activity."); see also *Marvin v. Marvin*, 18 Cal.3d 660, 134 Cal.Rptr. 815, 557 P.2d 106, 113 n. 5 (1976) (noting that "[a] promise to perform homemaking services is, of course, a lawful and adequate consideration for a contract" between non-married cohabitants); *Wilcox v. Trautz*, 427 Mass. 326, 693 N.E.2d 141, 145 (1998) (holding that express contractual agreements between nonmarried cohabitants "are not invalid merely because the parties may have contemplated the creation or continuation of a nonmarital relationship when they entered into the agreement").[4] This remains true even if the parties were also involved in a homosexual relationship when they entered into the contract. *See Whorton v. Dillingham*, 202 Cal.App.3d 447, 248 Cal.Rptr. 405, 409–10 (1988) (holding that a same-sex, non-married cohabitant's alleged services as a chauffeur, bodyguard, secretary, and business partner were, if proven true, sufficient independent consideration for the formation of a contract).

 Moreover, parties who engage in or who have engaged in certain illegal or "meretricious" acts are not necessarily precluded from contracting with each other on other matters. *Marvin*, 134 Cal. Rptr. 815, 557 P.2d at 116 (holding that "adults who voluntarily live together and engage in sexual relations are nonetheless as competent as any other persons to contract respecting their earnings and proper-

ty rights"); see also *Rubano v. DiCenzo*, 759 A.2d 959, 972 (R.I.2000) (holding that Superior Court possessed concurrent jurisdiction with Family Court to decide whether to enforce an alleged visitation and co-parenting agreement between two women who were former cohabitants). The mere existence of a sexual relationship between two parties does not impair their right to contract with each other for consideration independent of the relationship. *Marvin*, 134 Cal.Rptr. 815, 557 P.2d at 112. For example, an in-home caregiver may be involved in an adulterous, sexual relationship with her charge, yet still be entitled to receive payment for the services she performed as a nurse. *See In re Estate of Steffes*, 95 Wis.2d 490, 290 N.W.2d 697, 709 (1980) (holding that an in-home nurse was not precluded from collecting for services rendered by the fact that she also engaged in an adulterous relationship with her charge). Thus, a contractor could enter into an adulterous, sexual relationship with a homeowner, yet still be entitled to be paid for remodeling the kitchen as per the parties' agreement—even if both parties were living together during the project. In any event, it is not illegal for two men to live together, much less to contract and to enter into partnerships with each other while doing so. *See Whorton*, 248 Cal. Rptr. at 409–10 (discussing the right to contract between same-sex cohabitants). In sum, as long as the alleged consideration for the parties' putative agreement was not illegal, a suit for enforcement of that contract can proceed, subject to whatever other defenses may exist.

4. Since the California Supreme Court decided *Marvin* in 1976, more than thirty states have recognized the right of unmarried cohabitants to enter into express agreements with each other, and more than twenty of these states recognize both express and implied contracts between unmarried cohabitants. Only three states—Georgia, Illinois, and Louisiana—have refused to recognize property agreements or any kind of enforceable rights arising from or in connection with alleged contracts between unmarried cohabitants. For a recent survey of how different state courts have dealt with this issue, *see* Katherine C. Gordon, Note, *The Necessity and Enforcement of Cohabitation Agreements: When Strings Will Attach and How to Prevent Them—A State Survey*, 37 Brandeis L.J. 245, 253 (1998).

■ Furthermore, even in the absence of an enforceable contract, the equitable doctrine of unjust enrichment may apply under certain circumstances to prevent a person from retaining a benefit received from another without appropriate payment for same. *Rhode Island Hospital Trust Co. v. The Rhode Island Covering Co.*, 96 R.I. 178, 179–80, 190 A.2d 219, 220–21 (1963). Here, Burkland asserted that the legal consideration he provided to his former domestic partner for more than nine years unduly enriched plaintiff by benefiting his career and by helping him maintain his relationship with his children. Also, a resulting or constructive trust may have arisen in this case when plaintiff allegedly acquired property in his individual name during the relationship subject to an agreement to share the same with Burkland. At least, a court sitting in equity might be persuaded to grant such relief if, as Burkland alleged, plaintiff acquired certain property with the help of the legitimate services that Burkland provided to him under their alleged property-sharing arrangement. Such circumstances could give rise to an equitable duty on plaintiff's part to convey a fair portion of the acquired property to Burkland, especially if doing so would serve to avoid unjust enrichment. *See, e.g., Desnoyers v. Metropolitan Life Insurance Co.*, 108 R.I. 100, 112–13, 272 A.2d 683, 690 (1971).

In sum, we are of the opinion that the motion justice acted prematurely in dismissing these counterclaims. They alleged sufficient facts to conclude that, if Burkland proved them to be true, the court could grant him some type of legal or equitable relief.

### Use of Pseudonyms

■ We also disagree with the motion justice's decision to allow plaintiff to proceed under a pseudonym and to redact plaintiff's real name from all documents filed in this case after the commencement of the action. Regardless of whether one or both parties may have been entitled to proceed under a pseudonym *ab initio*, plaintiff should not have been allowed to unring the bell that he had been tolling for approximately nine months after he began this lawsuit in his own name. On the contrary, by intentionally filing this lawsuit in his own name, and thereafter, over the course of the next nine months—while litigating defendants' counterclaims to judgment—by publishing various additional legal documents in the Superior Court and in this Court that identified both parties by name and that characterized both of them as former "non-married paramours," plaintiff himself exposed to the public—under his real name—the very information he now alleges to be of an intensely private nature. Under these circumstances, we hold, plaintiff waived any right to have the record belatedly altered and to litigate this case under a pseudonym.[5]

5. In addition to his original verified complaint, plaintiff filed several other documents under his own name in the Superior Court's publicly accessible court records, including his motion to dismiss, his memorandum of law in support of the motion to dismiss, and his reply memorandum to Burkland's objection to that same motion. In this Court, plaintiff also filed his prebriefing statement under his real name, as well as a motion to dismiss Burkland's appeal before moving for leave to use a pseudonym. Thus, for almost nine months plaintiff litigated this case in both courts without taking any steps whatsoever to conceal his identity; nor, for that matter, did he pull any punches in describing the alleged homosexual nature of their relationship. On the contrary, he peppered his public filings with allegations that a "meretricious" relationship existed between the parties, one in which they "were dating" and then "cohabited" as "non-married paramours." The Superior Court heard plaintiff's motion to dismiss in open court on January 23, 2001, and still plaintiff proceeded to liti-

As other courts have observed, the "customary and constitutionally-embedded presumption of openness in judicial proceedings" requires that litigants proceed under their own names unless an exceptional circumstance requiring anonymity exists. *Doe v. Stegall,* 653 F.2d 180, 186 (5th Cir.1981); see also *Doe v. Frank,* 951 F.2d 320 (11th Cir.1992); *Doe v. University of Rhode Island,* 28 Fed. R.Serv.3d 366 (D.R.I.1993). For parties to litigate a case under a pseudonym, they must show that they possess a substantial privacy interest that outweighs the public's interest in disclosure. *Doe v. Prudential Insurance Co. of America,* 744 F.Supp. 40, 41 (D.R.I.1990). In addition, " '[t]here must be a strong social interest in concealing the identity of the plaintiff.' " *University of Rhode Island,* 28 Fed.R.Serv.3d at 369. Risk of embarrassment or allegations of economic harm are insufficient. *Id.* Rather, the moving party must demonstrate that publishing his or her identity in connection with the lawsuit will result in social stigmatization, put him or her in danger of physical harm, or cause the very harm that the litigation seeks to prevent. *Id.*

It is true that various courts have allowed plaintiffs to file suit under a pseudonym when they otherwise would be forced to disclose publicly their previously undisclosed status as homosexuals in the course of the litigation. *See, e.g., Doe v. Blue Cross & Blue Shield of Rhode Island,* 794 F.Supp. 72, 75 (D.R.I.1992); *Doe v. Commonwealth's Attorney for City of Richmond,* 403 F.Supp. 1199 (E.D.Va. 1975), *aff'd,* 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751, *reh'g denied,* 425 U.S. 985, 96 S.Ct. 2192, 48 L.Ed.2d 810 (1976); *Doe v. Chafee,* 355 F.Supp. 112 (N.D.Cal.1973); *Doe v. United Services Life Insurance Co.,* 123 F.R.D. 437 (S.D.N.Y.1988). In each of these cases, however, the plaintiffs filed their original complaint anonymously and then sought the court's permission to remain so throughout the litigation via the use of a pseudonym. Here, however, plaintiff, now "John Doe," originally filed suit against Burkland using his real name. Thereafter, for almost nine months he proceeded openly to litigate this case to judgment under his legal identity before filing his initial motion on appeal to use a pseudonym and to seal the public pleadings and other documents that he previously had filed. Given these circumstances, plaintiff already has taken deliberate steps to expose the public to the very subject matter that he now seeks to cloak with anonymity—his former homosexual relationship with defendant. Thus, we have no need to conduct the type of analysis in this case that should occur whenever a party—typically at the outset of a case—has filed a timely motion for leave to litigate under a pseudonym.[6] At that time, the general

gate under his own legal identity. Not until April 13, 2001—almost nine months after he began this lawsuit—did plaintiff first file motions to litigate this case under a pseudonym and to have the record sealed in this Court. Apparently, plaintiff's newfound need to litigate this case under a pseudonym arose only when he belatedly realized that this Court might publish an opinion in this case using his real name to designate the lawsuit.

**6.** Factors that a court should weigh in determining whether a litigant who seeks to use a pseudonym has established sufficient cause to

do so include: (1) "the extent to which the identity of the litigant has been kept confidential. If the information has been publicized or freely disclosed by the party seeking pseudonymity, there is little privacy to protect[,]" Joan Steinman, *Public Trial, Pseudonymous Parties: When Should Litigants Be Permitted to Keep Their Identities Confidential?,* 37 Hastings L.J. 1, 38 (1985); (2) "the bases upon which disclosure is feared or sought to be avoided" *id.;* (3) "the magnitude of the public interest in maintaining the confidentiality of the litigant's identity" *id.* at 40; (4) "the undesirability of an outcome adverse to the

approach to such requests should be as follows:

"the court should employ a balancing test that weighs the rights and interests of each litigating party and the interests of the public. The courts should not permit pseudonymous litigation on demand nor categorically disallow it. Very early in the litigation the public will have relatively little interest in the litigants' names. * * *

By contrast, as the proceedings progress and the court decides issues presented by the parties, the values served by public scrutiny of the judicial process attach to an ever greater degree. Access to the identity of the litigants is an ingredient of that public scrutiny. Though not as critical as access to the proceedings, knowing the litigants' identities nevertheless tends to sharpen public scrutiny of the judicial process, to increase confidence in the administration of the law, to enhance the therapeutic value of judicial proceedings, and to serve the structural function of the first amendment by enabling informed discussion of judicial operations. In light of these salutary effects, the balancing test should become more onerous to the party granted pseudonymity and seeking to maintain it, from the time that the court renders any subsequent ruling or enters any subsequent orders requested by any of the parties." Joan Steinman,

*Public Trial, Pseudonymous Parties: When Should Litigants Be Permitted to Keep Their Identities Confidential?*, 37 Hastings L.J. 1, 36 (1985).

Here, the plaintiff started this lawsuit against Burkland using his own name. He then filed pleadings and legal memoranda over his own name that characterized Burkland's counterclaims as "palimony" and that referred to himself and Burkland as "nonmarried paramours"—characterizations that sat openly as a part of the public record in this case for an extended period before the plaintiff sought to shove them back into the closet through the retroactive use of a pseudonym. Although we are sympathetic to the sensitive subject matters at issue in this case, we cannot allow the plaintiff to remove from public scrutiny what he already has spread—repeatedly and intentionally—all over the public record. Because the plaintiff freely and intentionally disclosed his identity in connection with this case, and did so for an extended period in public filings and arguments, he failed to preserve what initially may have constituted a substantial interest in maintaining his privacy concerning these issues. On the contrary, we hold that the plaintiff's course of conduct in this case constituted a waiver of his right to retain and/or preserve his anonymity during these proceedings via the use of a pseudonym.

---

pseudonymous party that would be attributable to his [or her] refusal to pursue the case at the price of being publicly identified" *id.;* (5) "whether, because of the purely legal nature of the issues presented, or otherwise, there is an atypically weak public interest in knowing the litigants' identities" *id.* at 41; and (6) "whether the party seeking to sue pseudonymously has illegitimate ulterior motives." *Id.* On the other side of the equation, the court should evaluate the interest of the public in knowing the litigants' identities by considering: (A) "the universal level of public interest in access to the identities of litigants"

*id.;* (B) "whether, because of the subject matter of the litigation, the status of the litigant as a public figure, or otherwise, there is a particularly strong public interest in knowing the litigants' identities, beyond the public interest that normally obtains" *id.*, at 41–42; and (C) "whether the opposition to pseudonymity by [the other parties], the public, or the press is illegitimately motivated" *id.* at 42; for example, "by a desire to harass the party seeking to keep his [or her] identity confidential and to force that party to drop his or her lawsuit or defense in order to avoid disclosure." *Id.* (Omitting original emphases.)

### Conclusion

Accordingly, we sustain the appeal, vacate the order and judgment dismissing the counterclaims, and remand this case for further proceedings consistent with this opinion. We also vacate any previous orders that allowed the plaintiff to proceed under a pseudonym and to substitute original court filings with "John Doe" replacements. Hereinafter, on remand, the case shall proceed as any other Superior Court lawsuit, with both parties using their legal names, subject to whatever protective orders that the court may decide to issue with respect to specific documents or other evidence deserving of special protective measures to shield the parties' particularized and unwaived privacy interests or for other legitimate reasons.