**Gail M. NORTON, Plaintiff,**

v.

**Russell L. HOYT, Defendant.**

**No. 01–0156L.**

United States District Court, D. Rhode Island.

Aug. 13, 2003.

J. Ronald Fishbein, East Providence, RI, for Plaintiff.

Gerald C. DeMaria, Peter E. Garvey, Lisa A. Kelly, Higgins, Cavanagh & Cooney, Providence, RI, for Defendant.

## OPINION AND ORDER

LAGUEUX, Senior District Judge.

This matter is before the Court on Defendant's Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56. The disputed claims arise out of an adulterous twenty-three year relationship between Plaintiff and Defendant, during which time Defendant allegedly maintained that he would terminate his marriage, marry Plaintiff, and support her for the rest of her life. After close examination of the record and existing case law, this Court concludes that Defendant's Motion for Summary Judgment should be granted.

### FACTS AND TRAVEL

The "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," Fed. Civ. P. 56(c), reveal the following facts viewed in the light most favorable to Plaintiff.

On or about July 24, 1974, Plaintiff Gail M. Norton ("Norton" or "Plaintiff"), a Rhode Island resident, met Defendant Russell L. Hoyt ("Hoyt" or "Defendant"), a Connecticut resident, through mutual acquaintances. At that time Hoyt represented to Norton that he was divorced; in reality he was (and still is) married. Believing Hoyt was single, Norton initiated a relationship with him. Shortly thereafter, when it became apparent to Norton that he actually was married, Hoyt told Norton that he was getting a divorce. Moreover, on or about January 5, 1975, Hoyt told Norton that he had moved out of the marital residence, leading her to believe once again that he was getting a divorce. However, Hoyt was not in the process of getting a divorce when he made these statements to Norton. Because of those alleged continuing misrepresentations over many years, Norton continued to maintain a relationship with Hoyt, which lasted for twenty-three years in all.

When the pair began dating Norton was employed as an elementary school teacher in the Bristol, Rhode Island school system, a position she held for a number of years. Allegedly in reliance upon Hoyt's repeated promises to divorce his wife and marry her, Norton resigned that position in 1980. Norton asserts that at Hoyt's insistence and in reliance on his promises, she resigned in order to be available to travel with him around the world.[1]

The couple maintained a lavish lifestyle. Hoyt was part of the Newport, Rhode Island yachting crowd. Several times a year, they traveled together to destinations such as the Bahamas, London, and Block Island. In addition to bearing all travel and entertainment expenses, Hoyt provided Norton with material benefits and financial support. Specifically, Hoyt would pay rent on an apartment that they shared in Vermont, buy and maintain her automobiles, and make payments toward

---

**1.** Norton's resignation letter to the Bristol School Department tells a different story, as she explained that she was resigning to pursue creative endeavors.

the maintenance of a condominium they shared in Newport. Periodically, the couple would also discuss plans for their contemplated wedding. According to Norton, but for Hoyt's oft-repeated promises to divorce his wife, marry Norton, and support her for the rest of her life, she would have ended the relationship.

Alas, in life, all good things must come to an end and on or about March 11, 1998, Hoyt ended his relationship with Norton, explaining that he "needed space." Norton was understandably shaken by the news. Not long after, she reported experiencing nervousness and anxiety, frequently crying, feeling depressed and vulnerable, being unable to stay home alone, and having suicidal thoughts. Additionally, Norton reported "not being able to resume work and possibly not being able to commit to another relationship, perhaps ever." Head and stomach aches, vomiting and weight loss also allegedly ensued.

Norton sought medical attention to help her deal with the maladies allegedly occasioned by the split with Hoyt. She saw a registered nurse who was also a licensed social worker, and who recorded that the "presenting problem [was] her twenty-three year relationship in turmoil." According to the nurse/social worker Norton was, "very shocked, scattered [sic][shattered], and [experiencing] loss of concentration." In 1998 she also consulted psychiatrist Dr. Henry Altman, accompanied on several occasions by Hoyt. During one of those sessions Hoyt allegedly told Norton and Dr. Altman that he would continue to support Norton financially by giving her $70,000.00 to $80,000.00 per year. According to Norton, Hoyt did provide financial support for two years after the break-up in an amount in excess of $80,000.00.

Norton avers that at the time of the break-up Hoyt also promised her that he was going to put $100,000.00 in her bank account and set up a trust that would take care of her for life. Allegedly, Hoyt told Norton that, in order to protect her interests, and to fulfill these promises, he had written a letter to an attorney, David McOsker, evidencing his intentions. Several months after the split, Hoyt allegedly reaffirmed his promise to support Norton and assured her that he would not renege on it, stating, "I know my responsibilities." Subsequently, Norton contacted attorney McOsker and discovered that the letter never existed.

Nearly four months after the break-up, Norton, in a letter to attorney Matthew Callaghan, expressed a desire to reconcile with Hoyt. However, on March 3, 2001, realizing that reconciliation was not a viable option, Norton did the next best thing: she sued him. The five count Complaint she filed in Rhode Island Superior Court sitting in Newport County asserted claims of promissory estoppel (Count I), intentional infliction of emotional distress (Count II), the tort of outrage (Count III), fraud (Count IV), and breach of promise to marry (Count V), and sought $5,000,000.00 in compensatory damages and $7,000,000.00 in punitive damages. On April 3, 2001, Hoyt removed the action to this Court based on diversity of citizenship pursuant to 28 U.S.C. § 1332, and thereafter successfully challenged Counts III, IV, and V by filing a Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6). Remaining for disposition are the promissory estoppel claim contained in Count I and the claim for intentional infliction of emotional distress asserted in Count II. Both of these claims are the subject of Defendant's Motion for Summary Judgment.

## DISCUSSION

### I. Standard of Review: Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on summary judgment motions:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c).

The fundamental question is whether a genuine issue of material fact exists. "A 'genuine issue' is one 'supported by such evidence that a reasonable jury, drawing favorable inferences, could resolve it in favor of the nonmoving party.'" *Hershey v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 317 F.3d 16, 19 (1st Cir.2003)(quoting *Triangle Trading Co. v. Robroy Indus.*, 200 F.3d 1, 2 (1st Cir.1999)). Likewise, a material fact is one which "might affect the outcome of the suit under the governing law." *United States v. One Parcel of Real Prop.*, 960 F.2d 200, 204 (1st Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

On a motion for summary judgment, the moving party bears the initial burden of showing that there are no genuine issues of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This burden may be met by demonstrating to the court that a lack of evidence exists to support the nonmoving party's case. *Rochester Ford Sales, Inc. v. Ford Motor Co.*, 287 F.3d 32, 38 (1st Cir.2002). Upon discharging that burden, the nonmoving party must show that the trier of fact could reasonably find in favor of the nonmoving party with respect to each issue on which that party has the burden of proof at trial. *Id.* In the end, the court must view all evidence and related inferences in the light most favorable to the nonmoving party. *Id.* "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I*, 53 F.3d 454, 460 (1st Cir.1995). Similarly, "[s]ummary judgment is not appropriate merely because the facts offered by the moving party seem most plausible, or because the opponent is unlikely to prevail at trial." *Gannon v. Narragansett Elec. Co.*, 777 F.Supp. 167, 169 (D.R.I.1991).

## II. Subject Matter Jurisdiction

This Court has subject matter jurisdiction over this lawsuit based on the parties' diversity of citizenship. 28 U.S.C. § 1332(a)(1). In diversity cases, federal courts must apply the substantive law of the forum state, including that state's choice of law rules. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The parties do not dispute that Rhode Island law governs this case. Accordingly, this Court will resolve the instant motion by applying Rhode Island law, and, when appropriate, "persuasive adjudications by courts of sister states, learned treatises, and public policy considerations identified in state decisional law." *Blinzler v. Marriott Int'l Inc.*, 81 F.3d 1148, 1151 (1st Cir.1996).

## III. Intentional Infliction of Emotional Distress

The Complaint does not specify what conduct gave rise to Norton's claim for intentional infliction of emotional distress. However, at oral argument, Plaintiff's counsel asserted that the wrongful conduct was Hoyt's twenty-three year long misrepresentation that he was getting a divorce. However, it is clear that Plaintiff suffered no emotional distress during the affair; it was the end of the affair that caused her to become emotionally distraught.

■ Rhode Island law makes clear that in order to maintain a cause of action for intentional infliction of emotional distress a plaintiff must prove four elements: "(1) the conduct must be intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress in question must be severe." *Champlin v. Washington Trust Co. of Westerly*, 478 A.2d 985, 989 (R.I. 1984). Failure to prove any one of those elements leads to the claim's demise. *Id.*

The foregoing reflects the Rhode Island Supreme Court's adoption of the standard set forth in Restatement (Second) of Torts § 46 (1965). *See Champlin* at 988–89. The spirit of § 46 is captured in its oft-cited comment d:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

Restatement (Second) of Torts § 46 cmt. d at 73 (1965).

■ The Rhode Island Supreme Court has raised this already high bar by making physical symptomatology an additional predicate to recovering damages. *Reilly v. United States*, 547 A.2d 894, 899 (R.I. 1988). Rhode Island law requires that "psychic as well as physical injury claims must be supported by competent expert medical opinion regarding origin, existence and causation." *Vallinoto v. DiSandro*, 688 A.2d 830, 839 (R.I.1997)(citing *Ondis v. Pion*, 497 A.2d 13, 17 (R.I.1985)). Unsupported conclusory assertions of physical ills are insufficient to overcome a motion for summary judgment. *Clift v. Narragansett Television L.P.*, 688 A.2d 805, 813 (R.I.1996).

Crossing the threshold of the analysis requires determining whether, "the . . . relationship comprises the kind of soil in which the seeds of a § 46 claim for emotional harm may sprout." *Russell v. Salve Regina College*, 649 F.Supp. 391, 400 (D.R.I.1986), *aff'd*, 890 F.2d 484 (1st Cir. 1989), *rev'd on other grounds*, 499 U.S. 225, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991). The Rhode Island Supreme Court has recognized that this action can arise out of a number of different relationships. *See, e.g. Champlin*, 478 A.2d at 989 (debtor/creditor); *Elias v. Youngken*, 493 A.2d 158, 163–64 (R.I.1985)(employee/supervisor). Courts generally consider the nature and extent of the relationship in regard to the duty owed to each party and the vulnerability of the parties. *Russell* at 401.

While the Rhode Island Supreme Court has not explicitly approved the tort in the context of a romantic relationship or the termination of one, it has also shown no signs of limiting it to a select few pairs. *See Russell* at 400–01. Without definitively so deciding, availability of the claim to a scorned lover will, for present purposes, be assumed.

## A. Intentional or Reckless Conduct

■ To satisfy the first element of the four prong test the defendant's conduct must be intentional or in reckless disre-

gard of the probability of causing emotional distress. *Champlin v. Washington Trust Co. of Westerly,* 478 A.2d 985, 989 (R.I.1984). Intentionality plays dual roles in this context. First, the conduct itself must be volitional, or willful. In addition, the resulting harm must have been intended, or at least recklessly caused. *Russell v. Salve Regina College,* 649 F.Supp. at 401.

Norton identifies Hoyt's alleged misrepresentation that he was getting divorced as the purposeful conduct at issue. Unfortunately, she has offered nothing but conclusory statements to substantiate the claim that he was lying. Hoyt may well have intended to divorce his wife every time he told Norton that he was going to do so; she has presented no evidence calling into question his state of mind. Given the matter's posture, however, Norton is entitled to an inference that the duration of the alleged misrepresentation (twenty-three years), in light of the fact that he never did divorce his wife, casts sufficient doubt on Hoyt's intentions to permit characterization of his conduct as purposeful.

However, the harm must also be intentionally or recklessly inflicted, and Norton simply has not alleged that Hoyt intended to cause her harm at any point during their relationship. Norton attested to this herself in a letter to Hoyt's daughter, Catherine, in which she stated that Hoyt "put himself between a rock and a hard spot and keeps treading water. His stories are to protect and avoid conflict, not to hurt. He wants everyone to be happy. The blame falls on all who participate in the charade." (Def.['s] Ex. J, 15011). The record demonstrates that Hoyt exposed Norton to "jet set" experiences; he showered her with gifts, including cars and a condominium; and he took her around the world. These luxuries were hardly a source of harm to Plaintiff.

Furthermore, Hoyt's conduct, in order to be deemed reckless, must be in deliberate disregard of a high degree of probability that emotional distress will follow. *See, e.g., Clift v. Narragansett Television L.P.,* 688 A.2d 805, 813 (R.I.1996). The record is devoid of any evidence or allegation that Hoyt acted in reckless disregard by initiating, maintaining, and then terminating a consensual relationship with Norton.

### B. Extreme and Outrageous Conduct

Having determined that Norton has failed to clear the initial hurdle, discussion of the next element is nonetheless warranted, so as to more thoroughly dispose of the claim on its merits. To be actionable, the intentional conduct must also be extreme and outrageous. *Jalowy v. Friendly Home, Inc.,* 818 A.2d 698, 707 (R.I.2003)(quoting *DiBattista v. State,* 808 A.2d 1081, 1088 (R.I.2002)). The Restatement counsels that, "[l]iability [exists] only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Restatement (Second) of Torts § 46 cmt. d at 73 (1965).

In determining whether the conduct surpasses the bounds of decency three factors are relevant: "(i) the conduct itself, (ii) in light of the particular relationship of the parties, (iii) having in mind the known (or knowable) susceptibility of the aggrieved party to emotional injury." *Russell v. Salve Regina College,* 649 F.Supp. 391, 402 (D.R.I.1986).

### The Conduct Itself

Because there is no universal litmus test by which to identify extreme and outrageous behavior, the determination is a fact-specific one. *Borden v. Paul Revere Life Ins. Co.,* 935 F.2d 370, 380 (1st Cir.

1991). It is clear that engaging in an adulterous affair, ending that affair and refusing to divorce one's wife-is neither extreme nor outrageous. An openly conducted affair, although considered reprehensible, does not constitute extreme and outrageous conduct that is beyond all possible bounds of decency. *See, e.g., Quinn v. Walsh*, 49 Mass.App.Ct. 696, 732 N.E.2d 330, 339 (2000)(quoting *Agis v. Howard Johnson Co.*, 371 Mass. 140, 355 N.E.2d 315 (1976))(quoting Restatement (Second) of Torts, § 46 cmt. d (1965)). Nor will a consensual sexual relationship support a claim for intentional infliction of emotional distress. *See, e.g., Korper v. Weinstein*, 57 Mass.App.Ct. 433, 783 N.E.2d 877, 882 (2003)(citing *Quinn v. Walsh*, 49 Mass. App.Ct. 696, 732 N.E.2d 330, 339 (2000)); *cf. Whittington v. Whittington*, 766 S.W.2d 73, 74 (Ky.Ct.App.1989)("adultery can never reach the status of outrageous conduct"); *Strauss v. Cilek*, 418 N.W.2d 378, 380 (Iowa Ct.App.1987) ("defendant's conduct in participating in a [consensual] sexual relationship with ... his friend's wife ... over an extended period, is [not] atrocious"); *Poston v. Poston*, 112 N.C.App. 849, 436 S.E.2d 854, 856 (1993)("allegation of adultery does not evidence ... extreme and outrageous conduct").

Plaintiff, however, argues that the outrageous conduct lies not in Hoyt's refusal to divorce his wife but in his twenty-three year long misrepresentation that he was getting a divorce. In reliance on this misrepresentation, Norton alleges that she passed up other opportunities such as building a career and becoming economically independent. While this conduct may give offense to Plaintiff, and civilized society may find it distasteful, it is not fairly characterized as so extreme and outrageous as to be atrocious and utterly intolerable in a civilized community. *See Swerdlick v. Koch*, 721 A.2d 849, 863 (R.I.

1998). The Rhode Island Supreme Court has been reluctant to lessen the strict requirements of this tort and has noted that, "[c]ertainly the law should not compensate for every minor psychic shock incurred in the course of daily living; it should not reinforce the neurotic patterns of our society." *D'Ambra v. United States*, 114 R.I. 643, 338 A.2d 524, 529 (1975). In the end, the termination of a meretricious relationship, and electing to stay with one's spouse and children cannot be called "outrageous" by any reasonable observer.

*Particular Relationship between the Parties*

Next, the conduct must be evaluated in light of the particular relationship between the parties. As previously noted, courts recognize this tort in a variety of relationships. Specifically, they focus on the relationship in light of the duties owed and the degree of vulnerability between the parties. The Restatement advises that extreme and outrageous conduct "may arise from an abuse by the actor of a position, or relation with the other which gives him actual or apparent authority over the other, or power to affect his interests." Restatement (Second) of Torts § 46 cmt. e at 74 (1965).

Context here is very significant. This case arises out of a voluntarily initiated and sustained romantic relationship between the parties, both of whom were educated and self-sufficient. Neither party was in a position of authority over the other; no fiduciary duties existed.

Most importantly, Norton was without question aware that Hoyt was conducting an adulterous relationship, one that he had initiated by lying about his marital status and telling her that he was divorced. In sum, the parties' relationship was founded in significant part on deceit; Norton cannot now express indignation and expect to

recover damages because her married lover allegedly lied to her once more and then ended the charade.

*Known Susceptibility to Emotional Injury*

■ The record is also bereft of any suggestion that the Defendant was aware that the Plaintiff was particularly susceptible to emotional injury. The outrageousness of particular conduct "... may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity." Restatement (Second) of Torts § 46 cmt. f at 75 (1965). Only after Hoyt ended the affair did Norton complain of emotional disturbance and physical maladies. Norton has not alleged that Hoyt purposefully continued the relationship with knowledge that the relationship was emotionally taxing to Norton. To the contrary, even subsequent to the relationship's dissolution, Norton expressed a desire to reconcile with Hoyt.

This conclusion would be no different were the alleged outrageous conduct the whole course of behavior detailed in the Complaint, specifically Hoyt's refusal to divorce his wife and marry and support Norton. Hoyt was entitled to end the relationship and refuse to terminate his marriage. It is well-settled that "the actor is never liable for example, where [the actor] has done no more than to insist upon his [or her] legal rights in a permissible way, even though he [or she] is well aware that such insistence is certain to cause emotional distress." *Clift v. Narragansett Television L.P.*, 688 A.2d 805, 813 (R.I.1996)(quoting *Howell v. New York Post Co.*, 81 N.Y.2d 115, 596 N.Y.S.2d 350, 612 N.E.2d 699, 705 (1993))(quoting Restatement (Second) of Torts § 46 cmt. g at 76(1948)). It should require no citation to state that one may break up with one's girlfriend without incurring tort liability.

To echo, once more, the words of the Rhode Island Supreme Court: the law "should not reinforce the neurotic patterns of our society." *See, D'Ambra v. United States,* 114 R.I. 643, 338 A.2d 524, 529 (1975).

## IV. Promissory Estoppel

■ Rhode Island law recognizes the doctrine of promissory estoppel, and has applied the doctrine in "those circumstances wherein one promises to do or not to do something in the future." *East Providence Credit Union v. Geremia,* 103 R.I. 597, 239 A.2d 725, 727 (1968). The Restatement (Second) of *Contracts* § 90 at 242 (1981), describes the doctrine as: "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Its application serves as a substitute for consideration, insofar as "the acts of reliance by the promisee to his detriment" constitute the consideration. *Geremia,* 239 A.2d at 728.

■ In Rhode Island, a promissory estoppel claim requires: "1) A clear and unambiguous promise; 2) Reasonable and justifiable reliance upon the promise; and 3) Detriment to the promisee, caused by his or her reliance on the promise." *Filippi v. Filippi,* 818 A.2d 608, 625–26 (R.I.2003)(citing *Nilavar v. Osborn,* 127 Ohio App.3d 1, 711 N.E.2d 726, 736 (1998)).

Norton avers that she relied to her detriment upon Hoyt's promise to divorce his wife, marry Norton and provide lifetime support to Norton. (Complaint ¶ 1.2.) Alternatively, she frames the promise by Hoyt as one to provide lifetime support to her regardless of whether he divorced his wife or not. (Def.['s] Ex. C at 23–24). At oral argument Plaintiff's counsel repre-

sented that the latter promise, that Hoyt would take care of Norton for life, was the one on which she was basing her claim.

### A. Clear and Unambiguous Promise

The first prong of the test requires a clear, unconditional, and unambiguous promise that would reasonably produce forbearance on the part of the promisee. *B.M.L. Corp. v. Greater Providence Deposit Corp.*, 495 A.2d 675, 677–78 (R.I.1985). The terms of that promise must be certain. *Id.* at 677.

Even viewed most favorably to the Plaintiff, the record fails to reveal a clear, unconditional, and unambiguous promise. Plaintiff's vacillations have not helped her cause. First, she claimed that Hoyt promised to divorce his wife, marry her and provide lifetime support to her. (Complaint ¶ 1.2). Then she changed her mind and the promise became one to provide lifetime support to her regardless of whether Hoyt divorced his wife or not. (Def.['s] Ex. C at 23–24). Finally at the hearing on this motion, counsel argued that Hoyt had simply promised to take care of Norton for life. However, there can be many interpretations of the phrase, "take care of for life". It could refer to care in a social, emotional, or financial context. As other courts have recognized, this is certainly not a clear and unambiguous promise. *See, e.g., Morone v. Morone*, 50 N.Y.2d 481, 429 N.Y.S.2d 592, 413 N.E.2d 1154, 1157 n. 3. (1980)(citing *Dombrowski v. Somers*, 41 N.Y.2d 858, 393 N.Y.S.2d 706, 362 N.E.2d 257 (1977)).

In *Filippi v. Filippi*, 818 A.2d 608 (R.I. 2003), in a breach of contract action against decedent's estate, decedent's daughter alleged that decedent promised that the family restaurant, "will be yours and you will take care of the family", if she came back to manage the business. The Rhode Island Supreme Court held that the promise was unenforceable because it was unclear and ambiguous. *Id.* The Court reasoned that the promisor "failed to indicate whether he meant [the restaurant] as the business including the good will or simply the stock of [the holding company] which owned the physical assets of [the restaurant]." *Id.* at 626. Likewise, the promise in the case at bar is not clear on its terms.

By belatedly couching Hoyt's promise as one simply to take care of her for life, Norton actually undermines her claim, because she has represented in her answers to Defendant's Interrogatories that she would not have remained in the relationship if he had not promised to get divorced. Thus, any reliance on her part is definitively linked to Hoyt's promise to marry her, not simply the promise that Hoyt would support her for life. Thereby, she intertwines Hoyt's marital status back into the alleged promise.

### B. Reasonable and Justifiable Reliance

Even assuming, *arguendo*, that there was a clear and unambiguous promise, Norton's reliance upon that promise was unreasonable. Though the couple had discussions about their life together and even discussed potential wedding plans, Plaintiff knew that Hoyt was married, and that he spent time at the marital domicile with his wife and children. Norton and Hoyt never openly associated as husband and wife, their friends and family knew that they were not married and they did not exclusively cohabitate. Furthermore, Norton knew that Hoyt had lied in the past, was in an adulterous relationship, and apparently had made little effort to fulfill the terms of the promise. Whatever detriment she suffered occurred with full knowledge that she was relying upon an adulterer; the law will not insure the decision to repose her confidence there. Reli-

ance upon an unclear and ambiguous promise made by an apparently unreliable man was imprudent.

## C. Detrimental Reliance

■ Finally, and for the sake of completeness, promissory estoppel requires that the promisee rely to his or her detriment on a promise made by the promisor. *See Alix v. Alix,* 497 A.2d 18, 21 (R.I.1985). Norton claims that she, in reliance on Hoyt's promises and, in fact, at his insistence, left gainful employment as a school teacher. She also claims that she gave up the opportunity to marry and have children at a younger age, and did not attempt to achieve her own financial security. Once again, however, Norton has stated that she remained in the relationship based solely upon Hoyt's promise to get a divorce. It is not clear that she relied to her detriment based on a promise for lifetime support. Any detrimental reliance flowed from the promise to remain together.

In any event, whatever form her reliance took, it is insufficient to overcome the other fatal flaws in her claim. Any promise for support that Hoyt made prior to the March 11, 1998 break-up is ambiguous at best, and, considering the source, was not a reasonable basis upon which to ground reliance.[2] Sometime between year one and year twenty-three of the affair, it should have become clear to Norton that her reliance on Hoyt's promise to divorce his wife and marry her was misplaced.

## V. Public Policy Considerations

Plaintiff's failure to establish the elements of promissory estoppel, of course, dooms her claim. The outcome would be no different, however, had Norton not recast the alleged promise as one merely for support, rather than, as the Complaint sets forth, a promise by Hoyt to first divorce his wife, marry Norton and then also to support her. In the latter case, even if Norton had proffered sufficient evidence to make out a claim, public policy would frown on enforcing that set of promises.

■ The doctrine of estoppel "... has no application to a contract or instrument which is void because it violates an express mandate of the law or the dictates of public policy." *Doherty v. Bartlett,* 81 F.2d 920, 925 (1st Cir.1936)(construing New Hampshire law). The public policy in favor of marriage militates against recognizing support claims arising from adulterous relationships. "The institution of marriage is so firmly established in the mores of Anglo–American society [that] agreements believed to be, 'in derogation of marriage' are held to be against public welfare and illegal." 15 Arthur Linton Corbin, Corbin on Contracts, § 1474 at 537 (1962). Therefore, an agreement in furtherance of facilitating divorce proceedings is illegal and contrary to public policy. *Id.* at 541. *See also, Pickles v. Pickles,* 70 R.I. 13, 36 A.2d 110, 112 (1944)(six month time period for reconciliation before divorce becomes final served the declared public policy of the state to preserve the marital union rather than to expedite its dissolution); *James v. Steere,* 16 R.I. 367, 16 A. 143 (1888)(essential purpose of deed was to coerce wife to separate from husband, therefore deed violated public policy); *Capazzoli v. Holzwasser,* 397 Mass. 158, 490 N.E.2d 420, 421 (1986)(man's promise to support a woman if she abandoned or

---

**2.** Of course, Norton has alleged specifically that Hoyt promised, in the presence of a doctor, that he would support her annually in the amount of $70,000–$80,000. She has not, however, marshaled any evidence that demonstrates that she relied on that specific promise in any way. The affair was over then.

promised to abandon her marriage to another man violated public policy).

Moreover, permitting a promissory estoppel claim based on a promise by Hoyt to divorce his wife, marry Norton and provide her with lifetime support would amount to re-instituting the breach of promise to marry claim that has already been dismissed. *Cf.,* Corbin on Contracts, § 1475 at 545 (1962) ("it is contrary to public policy and illegal for one who has a living spouse to make an engagement to marry another, [regardless of the fact] that the parties to the first marriage are separated and that the new agreement is expressly made conditional on procuring a divorce").

Plaintiff relies heavily on *In the Matter of Estate of Arthur J. Roccamonte, Sr.,* 174 N.J. 381, 808 A.2d 838 (2002) and *Doe v. Burkland,* 808 A.2d 1090 (R.I.2002). That reliance is misplaced. In *Roccamonte,* a then unmarried female cohabitant brought a claim for lifetime financial support against the estate of her former lover based on an oral promise of support. The New Jersey couple had lived together as husband and wife for twenty-five years despite both being married to others. Because of decedent's refusal to divorce his wife and marry her, plaintiff left New Jersey and moved to California, thereby terminating their relationship. Decedent persistently contacted plaintiff and in order to induce her to come back to New Jersey promised her that if she came back to him, he would divorce his wife and provide her with lifetime financial support. Based upon that promise plaintiff returned to New Jersey, officially divorced her husband, and resumed the relationship with decedent until his death.

The *Roccamonte* Court held that the agreement was enforceable because the plaintiff had suffered a bargained for detriment as consideration for the oral promise.

*Id.* at 845–46. The Court determined that the plaintiff was specifically induced to move back to New Jersey from California, divorce her husband and to resume the relationship, in express reliance on decedent's promise. *Id.* at 846.

The facts of *Roccamonte,* and in particular the character of the reliance, are distinguishable from the case at bar. In *Roccamonte,* the plaintiff clearly relied to her detriment on the express promise of her lover: she moved across country, divorced her husband, and moved in with the decedent, all because he promised to support her. Even if Norton could prove that Hoyt made such a clear and unambiguous promise to her, she could not demonstrate an analogous degree of reliance.

■■■ Furthermore, unlike New Jersey, *see Roccamonte* at 843, Rhode Island has not recognized "palimony" as a cause of action. The term "palimony" has a "meaning similar to 'alimony' except that [the] award, settlement or agreement arises out of [the] nonmarital relationship of parties (i.e. nonmarital partners)." *Black's Law Dictionary* 1110 (6th ed.1990). Palimony is a cause of action that permits recovery of future support from an unmarried cohabitating partner, if one of those partners is induced to sustain or initiate the relationship because of a promise of support. *Roccamonte,* 808 A.2d at 842 (citing *Kozlowski v. Kozlowski,* 80 N.J. 378, 403 A.2d 902 (1979)).

The word "palimony" was coined by the national media in the early 1970's at the time of the Marvin case, infra in California. That case and a spate of other cases like it were filed in California in that period in an attempt to legitimize a claim for support arising out of extra-marital relationships that had became common place in that part of the country. This Court is familiar with those times because this writ-

er took a seat on the state trial bench in 1968 and later presided over a highly publicized alienation of affections and criminal conversation[3] case which also caught the fancy of the national media as well as the international press. *See Zarrella v. Robinson,* 460 A.2d 415 (R.I.1983). The liberal views on this subject expressed by the proponents of a "palimony" cause of action never really caught hold throughout the remainder of this more conservative and family oriented country although some courts have paid lip service to the concept.

Although some courts have awarded future support and/or property rights to a nonmarital partner in the absence of an express contract, *see Marvin v. Marvin,* 18 Cal.3d 660, 134 Cal.Rptr. 815, 557 P.2d 106 (1976); *In Matter of Estate of Arthur J. Roccamonte, Sr.,* 174 N.J. 381, 808 A.2d 838 (N.J.2002); most state courts will not award future support and/or property rights without an explicit agreement. *See Wilcox v. Trautz,* 427 Mass. 326, 332, 693 N.E.2d 141 (Mass.1998)(no property rights for a nonmarital partner absent an express contract); *Davis v. Misiano,* 373 Mass. 261, 263, 366 N.E.2d 752 (1977) (nonmarital partners have no right to separate support and alimony); *Tapley v. Tapley,* 122 N.H. 727, 449 A.2d 1218, 1219 (1982)(declining to extend recovery for domestic services beyond express contract); *Morone v. Morone,* 50 N.Y.2d 481, 429 N.Y.S.2d 592, 413 N.E.2d 1154 (1980)(New York recognizes as enforceable express but not implied contracts).

Here, Norton is essentially clothing a palimony claim in other robes. Rhode Island, however, has not recognized palimony as a cause of action and the Rhode Island Supreme Court has shown no inclination to do so. The *Burkland* holding does not support Plaintiff's position.

In *Burkland,* the Rhode Island Supreme Court merely recognized the rights of nonmarried cohabitants to contract with each other for consideration independent of their relationship. *See Doe v. Burkland,* 808 A.2d 1090 (R.I.2002). There, two men lived together as domestic partners for nine years, after which the relationship ended. *Id.* at 1092. The plaintiff sued for injunctive relief to stop alleged harassment by the defendant. The defendant in turn counterclaimed for breach of an oral agreement he had made with the plaintiff to share equally any property that either party had acquired individually during their relationship. *Id.* The defendant alleged that he had devoted his skills, effort, labors and earnings to assist plaintiff in his career, and that he had provided homemaking services, business consulting, and counseling to plaintiff in consideration for the alleged property sharing agreement. *Id.* at 1093. The Court held that the defendant had stated a cause of action for breach of the oral agreement, and he could recover if he could prove that the plaintiff had actually acquired certain property with the help of the defendant's legitimate services. *Id.* at 1095.

*Burkland* is clearly inapposite here. Norton is seeking enforcement of a promise for future support payments: in a word, palimony. There was no property sharing agreement between Norton and Hoyt; no express agreement of any kind, merely an alleged, ambiguous promise to provide support. The clear implication from *Burkland* is that a palimony cause of action will not prosper in Rhode Island especially when the relationship was adulterous.

## VI. Domestic Relations Exception

 Plaintiff perfunctorily argues that the domestic relations exception to

---

**3.** Criminal conversation is the civil counterpart to the crime of adultery.

federal diversity jurisdiction requires remanding the case to state court. In equally abrupt fashion: she is mistaken. The domestic relations exception requires abstention by federal courts in only a narrow category of cases, specifically those involving divorce, alimony and child custody decrees. *See Ankenbrandt v. Richards*, 504 U.S. 689, 703, 112 S.Ct. 2206, 119 L.Ed.2d 468 (1992). Norton's claims sound in tort and contract. The Rhode Island Family Court would have no jurisdiction in this case, *see* R.I. Gen. Laws § 8–10–3 (1956), and that is undoubtedly why Plaintiff brought the suit originally in Rhode Island Superior Court. The domestic relations exception is clearly inapplicable to this case.

### Conclusion

For the foregoing reasons, the Court hereby grants Defendant's Motion for Summary Judgment on Counts I and II of the Complaint. Since Counts III, IV and V have already been dismissed, the Clerk shall enter judgment for Defendant on all Counts of the Complaint, forthwith.

It is so ordered.